NILDA EUNICE PÉREZ TORRES, ETC., demandantes y recurridos, *v.* DR. WALLACE BLADUELL RAMOS y OTROS, demandados y recurrentes.

Número: R-84-541    Resuelto: 15 de enero de 1988

*José A. Rivera Mercado*, abogado de los recurrentes; *Felícita Pé-rez de Torres*, abogada de los recurridos.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Las acciones por alegada impericia médica constitu-yen o representan un reto especial para los jueces. Dichos casos siempre versan sobre la ocurrencia de un daño; uno que, por lo general, resulta impresionante y doloroso. No obstante el natural sentimiento de compasión que todo ser

humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, los jueces tenemos que mantener siempre presente que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo. En otras palabras, no podemos darnos el lujo de que nuestros sentimientos dominen nuestro discernimiento. De así permitirlo, estaríamos incumpliendo con nuestra función como jueces. Con ello en mente, examinemos el caso de epígrafe.

## I

La codemandante Nilda Eunice Pérez Torres —quien es enfermera profesional de vasta experiencia—(1) contrató los servicios profesionales del obstetra y ginecólogo Dr. José A. De Castro Peña para que la atendiera y asistiera durante su cuarto embarazo y alumbramiento, siendo examinada periódicamente por éste durante el período prenatal. Habiendo sufrido el doctor De Castro un quebranto de salud, éste hizo arreglos con el también obstetra y ginecólogo Dr. Wallace Bladuell Ramos —especialista de más de diez y nueve años de experiencia para la fecha de los hechos a los que se contrae la demanda— para que atendiera sus pacientes, hecho al cual dieron su anuencia la codemandante Pérez Torres y su esposo el codemandante Pedro Rivera Vázquez.

El día 13 de septiembre de 1979 y a las 8:40 de la noche ingresó la Sra. Nilda Eunice Pérez Torres en la Sala de Partos del Hospital Santo Asilo de Damas.(2) Personal del hospital notificó por radioteléfono al doctor Bladuell Ramos

---

(1) La señora Pérez Torres ha trabajado como supervisora de sala de operaciones, Supervisora General del Centro Médico de Mayagüez y Supervisora de Sala de Emergencia del Hospital Doctor Tito Mattei de Yauco, Puerto Rico.

(2) Doce días antes —el 1ro de septiembre de 1979— la codemandante Pérez Torres, creyendo estar de parto, había acudido a la Sala de Emergencia del Hospital Santo Asilo de Damas de Ponce, Puerto Rico, donde fue admitida a las 11:40 P.M. Luego de ser examinada, y no estando de parto, la referida codemandante fue dada de alta en horas de la madrugada del día siguiente.

en su residencia. El referido galeno, en contestación a la llamada, acudió al hospital, donde recibió de la enfermera graduada a cargo de la Sala de Partos el récord médico de la señora Pérez Torres. Se dirigió inmediatamente a la Sala de Antepartos, donde examinó a la paciente a las 9:50 P.M. Observó que el abdomen no estaba duro, hecho indicativo de ausencia de contracciones, condición que le confirmó la paciente. Surgía, además, del récord de la paciente que ésta había reportado no tener contracciones al momento de ser admitida al hospital. Fue informado por la paciente que ésta había roto membranas en su casa como a las siete de la noche. Acto seguido, el doctor Bladuell procedió a examinarla vaginalmente. A raíz de dicho examen confirmó que la paciente efectivamente había roto membranas, o sea, que el parto podía ocurrir dentro de las próximas veinticuatro horas; que el cuello de la matriz no había borrado, lo que implicaba que no tenía dilatación y por tanto no "estaba de parto", y que el feto estaba en una presentación "de nalgas", lo cual confirmó a través de una pelvimetría radiográfica. Determinó y evaluó, además, mediante pelvimetría clínica o vaginal, que la arquitectura y capacidad de la pelvis eran adecuadas; que el feto "estaba flotando", o sea, que no había llegado a encajar en la parte inferior de la pelvis; que el peso aproximado del feto era de seis libras y media, y que no había insinuación de cordón umbilical.

Al considerar que la paciente no estaba de parto inmediato y que concurrían todos los factores favorables para darle una oportunidad de un parto vaginal, el doctor Bladuell Ramos dio instrucciones a las enfermeras para que mantuvieran a la paciente bajo observación continua, ordenándoles que cualquier cambio le fuera notificado a su residencia, la cual estaba a diez minutos del hospital, retirándose del hospital a las 10:20 P.M.

Consciente de que a las 11:00 P.M. había un cambio de turno de enfermeras, el doctor Bladuell Ramos llamó al hospital para cerciorarse de que éstas conociesen sus instrucciones previas y habló con la enfermera graduada que entró de turno, la cual le informó del resultado de las observaciones de la paciente hasta ese momento: sonidos fetales de 138 y contracciones internas leves. Surge del récord médico que a la 1:00 A.M. del día 14 de septiembre la paciente tenía contracciones moderadas cada 4 a 5 minutos y que a las 2:30 A.M. de dicho día las contracciones continuaban siendo moderadas y de cada 3 minutos.

A las 2:44 A.M., el doctor Bladuell Ramos es llamado e informado de que la paciente tiene contracciones moderadas cada tres minutos y que los signos fetales estaban en 120, a raíz de lo cual éste entonces le ordenó a las enfermeras colocar a la paciente en una posición conocida como posición de *Trendelenburg*, y que se le hiciera un *cross match* de sangre, por entender éste que la paciente estaba entrando en la fase de parto activo, indicando el doctor que salía para el hospital. El doctor Bladuell Ramos llega a la institución hospitalaria a las 3:10 A.M., donde es informado por la enfermera que un minuto antes, o sea, a las 3:09 A.M. se había observado la presencia del cordón umbilical, conocido esto como un "prolapso" de dicho cordón, hecho que confirmó. Ante esta situación, el doctor Bladuell Ramos procedió a practicarle a la paciente una operación cesárea de emergencia. La criatura nació en condiciones deprimidas y sufre de una condición de cuadriplejía irreversible por perlesía cerebral. Como consecuencia de estos hechos, los padres del niño, por sí y en representación de éste, radicaron demanda en daños y perjuicios contra, entre otros, el aquí recurrente doctor Bladuell Ramos.

El tribunal de instancia *adoptó la teoría expuesta durante el proceso celebrado por el perito médico presentado*

*por la parte demandante, Dr. José A. Gratacós.* No obstante
este perito aceptar que si los hechos ocurrieron según sur-
gen del récord médico de la paciente él, al igual que hizo el
doctor Bladuell Ramos, le hubiese dado la oportunidad a la
señora Pérez Torres de tener un parto vaginal, el doctor Gra-
tacós opinó —*según lo resume el propio tribunal de instan-
cia*— que "ante las circunstancias de una posición y presen-
tación del feto de nalgas, en una madre multípara que había
roto fuente, habiéndose diagnosticado que el feto se encon-
traba en estación flotando y estando el embarazo a término,
*era anticipable un mayor riesgo de prolapso del cordón um-
bilical y por tanto*, el obstetra Dr. Wallace Blad[u]ell Ramos,
*no debió abandonar la paciente para retirarse a dormir*".
(Énfasis suplido.) Anejo A, págs. 7–8.

A base de lo anteriormente expresado, el foro de instan-
cia específicamente determinó que "el médico demandado in-
currió en negligencia *al ausentarse del hospital* luego de
haber optado por la alternativa de parto por la vía vaginal".
(Énfasis suplido.) Anejo A, pág. 10. En su consecuencia, de-
claró con lugar la demanda radicada en cuanto al menor co-
demandante,(3) desestimando la misma, por razón de pres-
cripción, en cuanto a los padres del referido menor.

Inconforme, en revisión el doctor Bladuell Ramos le
imputa al tribunal de instancia la supuesta comisión de cinco
(5) errores, a saber:

### PRIMER ERROR

*Erró el tribunal sentenciador, al determinar como cuestión
de hecho y de derecho, que la norma de la profesión en la
práctica de la medicina obstétrica exige la presencia conti-*

---

(3) El tribunal de instancia condenó al Dr. Wallace Bladuell Ramos a pagar al
menor codemandante la suma de $400,000 "por concepto de todos los daños y
perjuicios sufridos por éste con motivo de los hechos que dan base al caso de
ep[í]grafe". Anejo A, pág. 13. En adición, lo condenó al pago de la cantidad de
$5,000 por concepto de honorarios de abogado y las costas del proceso.

*nua del médico al lado de la paciente, aun cuando ésta no esté de parto.*

## SEGUNDO ERROR

*Cometió error el tribunal de instancia, al responsabilizar al codemandado Dr. Wallace Bladuell Ramos y para ello, evaluar la prueba desfilada contrario al balance más racional, justiciero y jurídico.*

## TERCER ERROR

Incidió el tribunal de instancia, al resolver que las enfermeras asignadas a la Sala de Partos del Hospital Santo Asilo de Damas, por no ser obstétricas, no tenían licencia conforme a ley, para ejercer como tales.

## CUARTO ERROR

Cometió error el tribunal de instancia, al conceder una cuantía de daños exagerada, conforme a la prueba y en exceso de la suma reclamada por la parte demandante.

## QUINTO ERROR

Cometió error el tribunal de instancia, al determinar que el codemandado Dr. Wallace Bladuell Ramos fue temerario al defenderse de este pleito y condenarle al pago de honorarios de abogados. (Énfasis suplido.) Solicitud de Revisión, págs. 9–10.

## II

■ Conforme a la doctrina imperante en nuestra jurisdicción relativa a la responsabilidad de los médicos en casos de alegada mala práctica profesional, éstos vienen en la obligación de brindar a sus pacientes aquella atención que, a la luz de los modernos medios de comunicación y enseñanza, satisface las exigencias profesionales generalmente reconocidas por la propia profesión médica. Dicha norma fue establecida por este Tribunal hace más de una década en *Oliveros* v. *Abréu,* 101 D.P.R. 209, 226 (1973). Desde entonces la hemos ratificado en innumerables ocasiones. *Ríos*

*Ruiz* v. *Mark*, 119 D.P.R. 816 (1987); *Morales* v. *Hosp. Matilde Brenes*, 102 D.P.R. 188 (1974); *González* v. *E.L.A.*, 104 D.P.R. 55 (1975); *López* v. *Hosp. Presbiteriano*, 107 D.P.R. 197 (1978); *Negrón* v. *Municipio de San Juan*, 107 D.P.R. 375 (1978); *Cruz* v. *Centro Médico de P.R.*, 113 D.P.R. 719 (1983).

En el caso de *Oliveros* v. *Abréu*, ante, *revocamos* la norma que habíamos establecido en *Rivera* v. *Dunscombe*, 73 D.P.R. 819, 838 (1952), a los efectos de que un médico sólo viene obligado a dar a sus pacientes aquella atención médica que generalmente se emplea para casos similares por el resto de los médicos en la comunidad.

La diferencia entre ambas normas es obvia. Bajo la doctrina establecida en *Oliveros* v. *Abréu*, ante —en pleno vigor hoy día— un médico no queda exonerado de responsabilidad, en un caso de impericia médica, por el mero hecho de que le haya brindado a su paciente la atención médica que ordinaria y usualmente proveen sus colegas en la misma comunidad o "plaza" en que el médico se desenvuelve si esa atención no satisface las exigencias de la profesión médica en general a la luz de los modernos medios de comunicación y enseñanza. En otras palabras, el médico en nuestro país viene en la obligación de brindar a sus pacientes la mejor atención médica de acuerdo a los últimos métodos y procedimientos de la medicina moderna de que él pueda tener conocimiento. Ello obliga a todo médico —con el consabido beneficio para nuestra sociedad— a mantenerse "al día" en relación con los adelantos que a diario ocurren en la medicina a nivel mundial.

No obstante lo antes expresado, no debemos perder de vista que en el tratamiento de un paciente el médico posee amplia discreción profesional y que éste no incurre en responsabilidad si el tratamiento que le brinda a su paciente,

aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica; constituyendo defensa válida para el médico demandado la existencia de divergencia de criterios entre las autoridades médicas sobre si el tratamiento o procedimiento en particular era correcto bajo las circunstancias del caso. *Lozada* v. *E.L.A.*, 116 D.P.R. 202, 217 (1985); *Pérez Cruz* v. *Hosp. La Concepción*, 115 D.P.R. 721 (1984); *Fernández* v. *Hosp. Gen. San Carlos, Inc.*, 113 D.P.R. 761 (1983); *Cruz* v. *Centro Médico de P.R.*, ante; *López* v. *Hosp. Presbiteriano*, ante; *Oliveros* v. *Abréu*, ante. En palabras sencillas, el error de juicio —*honesto e informado*— cometido por un médico en el tratamiento de su paciente no constituye fuente de responsabilidad.

## III

La norma establecida en *Oliveros* v. *Abréu*, ante, es una sencilla y sabia. La dificultad estriba, naturalmente, en la aplicación de la misma a una situación de hechos en particular. Ahí es que surgen diferencias de criterio. En el presente caso, el Tribunal Superior de Puerto Rico, Sala de Ponce, entendió que el Dr. Wallace Bladuell Ramos efectivamente incurrió en responsabilidad en relación con la atención médica que le brindara a su paciente, la Sra. Nilda Eunice Pérez Torres.

Diferimos. Basamos nuestra conclusión a los efectos de que la conducta observada por el referido médico respecto a la mencionada paciente satisfizo las exigencias profesionales generalmente reconocidas por la propia profesión médica a la luz de los modernos medios de comunicación y enseñanza, precisamente en hechos que surgen de las propias determinaciones que realizara el tribunal de instancia y de los datos que surgen del récord médico de la codemandante Nilda Eunice Pérez Torres, el cual no ha sido objeto de impugnación.

La determinación sobre si el recurrente doctor Bladuell Ramos responde civilmente en el presente caso por los daños sufridos por la criatura codemandante *gira exclusivamente* sobre el punto de si a la luz de los hechos particulares del caso constituyó o no negligencia el hecho de que él, luego de examinar a la paciente Pérez Torres, se retirara a su casa en lugar de permanecer todo el tiempo junto a ella en el hospital.

Ello es así por cuanto nadie pone en duda que su conducta profesional, *antes* del prolapso del cordón umbilical y *con posterioridad* al mismo, satisfizo todas las exigencias profesionales generalmente reconocidas por la profesión médica a la luz de los modernos medios de comunicación y enseñanza. *Oliveros* v. *Abréu*, ante. Como hemos visto, el doctor Bladuell Ramos una vez fue notificado del ingreso en el hospital de la señora Pérez Torres el día 13 de septiembre de 1979 prontamente acudió al mismo, procediendo a realizar todos los exámenes requeridos y a tomar todos los pasos necesarios en esta clase de situaciones. Debe recordarse que, inclusive, el propio perito médico de la parte demandante aceptó que fue correcta la determinación del doctor Bladuell Ramos de esperar por el desarrollo normal de un parto vaginal. Tampoco debe pasarse por alto el hecho de que el doctor Bladuell Ramos, estando en su hogar, se comunicó por la vía telefónica con la supervisora del nuevo turno de enfermeras para cerciorarse que éstas conocían sus instrucciones respecto a la paciente. Por otro lado, una vez el doctor Bladuell Ramos regresa al hospital y se confronta con el prolapso del cordón umbilical, el cual había ocurrido momentos antes de su llegada, procede a tomar, y a realizar prontamente, el curso de acción aconsejable en esta clase de emergencia, esto es, someter a la paciente a una "operación cesárea".

Ante el fundamento utilizado por el tribunal de instancia para la determinación de negligencia resulta de

suma importancia señalar que para 1979 no existía, ni existe, una norma específica —*producto la misma de una directriz estatutaria o jurisprudencial*— que obligara al obstetra a permanecer todo el tiempo en el hospital junto a su paciente no obstante el examen que le practicara a la misma demostrara que ésta realmente no estaba de parto inmediato y que médicamente resultaba procedente esperar el desarrollo normal del alumbramiento. Por el contrario, existe una disposición *reglamentaria* del Departamento de Salud de Puerto Rico que le permite a un médico obstetra "delegar aquella parte del cuidado que *juzgue conveniente* en una o varias enfermeras o comadronas". (Énfasis suplido.) 24 R.&R.P.R. sec. 18–121(a).

Durante el proceso celebrado, tampoco se presentó evidencia a los efectos de que para el año de 1979 la práctica de excelencia de la obstetricia requiriera que los obstetras permanecieran todo el tiempo al lado de sus pacientes independientemente del hecho de que éstas no estuvieran próximas a un parto inmediato.

Sí presentó prueba la parte demandante, por conducto de su perito médico el doctor Gratacós, de que en vista de las *circunstancias particulares* presentes en el caso que nos ocupa, lo procedente hubiera sido que el doctor Bladuell permaneciera junto a la señora Pérez Torres en lugar de retirarse a su residencia. Recordemos que, según el testimonio del doctor Gratacós, esas circunstancias eran la rotura de fuente en una madre multípara, estando el feto en estación flotando, y en posición de nalgas. Examinemos las mismas.

En cuanto a la existencia de una ruptura prematura de las membranas en la paciente, está establecido en la práctica de la obstetricia y la ginecología que de ordinario, desde que se rompen membranas hasta el momento del parto, *pueden transcurrir hasta 24 horas.* R.C. Benson, *Diagnóstico y*

*Tratamiento Ginecoobstétricos*, México, Ed. El Manual Moderno, 1979, pág. 659.

En relación con la posición y presentación de nalgas en una multípara con embarazo a término, la situación amerita un poco más de discusión. Recordemos que la teoría del único perito médico de la parte demandante —teoría acogida por el tribunal de instancia— es a los efectos de que el médico demandado incurrió en negligencia por razón de que al irse a su residencia no estuvo presente "a tiempo" para bregar con el problema del prolapso del cordón umbilical, hecho que según dicho perito el médico demandado debió prever al percatarse que la criatura estaba en "posición de nalgas".

Surge del récord médico del hospital —el cual no se impugna por la parte demandante— que el prolapso del cordón umbilical ocurrió *a las 3:09 A.M.* del día en que ocurrió el alumbramiento. Surge igualmente de dicho récord que el doctor Bladuell Ramos confirmó este hecho —lo del prolapso— *a las 3:10 A.M.*, o sea, un minuto después de haber ocurrido el mismo. La prueba fue a los efectos de que una vez el galeno confirma ese hecho, inmediatamente ordena que se tomen las medidas necesarias para someter a la paciente a una cesárea, naciendo la criatura —según el récord médico— a *los veintinueve (29) minutos* del momento en que el doctor Bladuell Ramos confirmó el hecho del prolapso.

Según la declaración de uno de los peritos de la parte demandada, Dr. Karlis Adamsons —quien, dicho sea de paso, no sólo es un reconocido experto y respetada autoridad en el campo de la obstetricia y la ginecología, sino que es el Director del Departamento de Obstetricia y Ginecología del Recinto de Ciencias Médicas de la Universidad de Puerto Rico, donde trabaja como profesor el perito de la parte demandante—(4) el momento de la ocurrencia del prolapso del cor-

_____

(4) El doctor Adamsons es graduado de la Facultad de Medicina de la Universidad "George August" en Alemania, *Summa Cum Laude*, en 1952; está certi-

dón umbilical es algo que, aun cuando ocurre con cierta frecuencia, *no puede ser ni previsto ni evitado por ningún obstetra*, datos que son, o deben ser, del conocimiento de todo obstetra. Conforme al testimonio pericial del doctor Adamsons, lo importante en esta clase de situaciones es cuán rápido se hace la determinación de hacer, y de hecho se hace, una "cesárea" luego de la ocurrencia del prolapso y que en la mayoría de las instituciones médicas que él conoce a nivel mundial que están autorizadas para ofrecer servicios de obstetricia el "intérvalo de media hora se considera como tiempo normal para hacer una cesárea de emergencia". E.N.P., pág. 161. Por último, declaró el doctor Adamsons que no conoce de ninguna institución médica donde se exija, bajo los hechos de este caso, que el obstetra permanezca al lado del paciente y que, en su opinión, de no haber sido por la *pronta y correcta* actuación del doctor Bladuell Ramos "el bebito no hubiese sobrevivido al prolapso del cordón". E.N.P., pág. 161.

■ Somos del criterio que no pudiendo preverse y predecirse el momento de, ni evitarse, el prolapso del cordón

---

ficado por la American Board of Obstetricians and Gynecologists, y admitido a la práctica de la medicina en los estados de Nueva York, Rhode Island, y en Puerto Rico. Es miembro del American College of Obstetricians and Gynecologists, del Sloane Hospital Alumni Society, del Society for Gynecologic Investigation, del Society for Pediatric Research, entre otros; ha sido miembro de la Fundación Nacional de Parálisis Infantil, de la Sociedad Americana contra el Cáncer, entre otros; ha sido consultor y ha trabajado en el área de Obstetricia y Ginecología del Columbia-Presbyterian Medical Center, del Francis Delafield Hospital, Mount Sinai Hospital, Rhode Island Hospital, St. Vicent's Medical Centre of Richmond, entre otros; ha sido profesor de Obstetricia y Ginecología en Columbia University, Mount Sinai School of Medicine of the City University of New York, Profesor y Director del Departamento de Obstetricia y Ginecología de Brown University, entre otros; ha sido miembro del Comité del Consejo Asesor de Obstetricia y Ginecología de la Administración de Drogas y Alimentos del Gobierno de Estados Unidos; miembro de la Junta de Asesores Editoriales del American Journal of Obstetrics and Gynecology, Jefe del Comité Asesor en Obstetricia y Ginecología del Secretario de Salud de Puerto Rico, etc. Ha escrito libros y alrededor de cien publicaciones sobre Obstetricia y Ginecología.

umbilical; habiendo estado el doctor Bladuell Ramos en posición de lidiar con el mismo al minuto de su ocurrencia, y habiéndose llevado a cabo el nacimiento de la criatura dentro del período aceptable de treinta (30) minutos desde que ocurriera el prolapso, *realmente pierde importancia el hecho de que el médico demandado se hubiera retirado —independientemente de que lo podía hacer— del hospital a su residencia.*

Reconocemos, sin embargo, que es *factible* el argumento a los efectos de que el doctor Bladuell Ramos, en el uso de su buen juicio y discreción, debió haber optado en el presente caso por permanecer en el hospital. Ahora bien, si así no decidió hacerlo, lo más que tenemos es un *error de juicio*, honesto e informado, de su parte. No debemos perder de vista que nuestra jurisprudencia responsabiliza civilmente al médico cuando éste actúa negligentemente, utilizando métodos o procedimientos que no están acordes con la práctica moderna de excelencia de la medicina. *Oliveros* v. *Abréu*, ante. Un error de juicio honesto y razonable en el procedimiento que se utiliza por el médico no debe constituir base suficiente para la imposición de responsabilidad a éste, *Lozada* v. *E.L.A.*, ante; sobre todo cuando el patrón de conducta que él siguió es una práctica aceptada por la profesión médica moderna en esa clase de situaciones.

En resumen, procede decretar la revocación de la sentencia recurrida en vista de: que la práctica de excelencia de la obstetricia para el año de 1979 no exigía —ni exige— que un obstetra permaneciera todo el tiempo al lado de su paciente independientemente del hecho de que ésta no estuviera de parto, como tampoco existía —ni existe— norma jurisprudencial o estatutaria a esos efectos; que las circunstancias particulares presentes en el caso de epígrafe tampoco impedían que el doctor Bladuell Ramos, previa las ins-

trucciones correspondientes al personal del hospital, se retirara a descansar a su hogar desde donde permanecía atento y pendiente del alumbramiento; que somos de la opinión que nos enfrentamos en el presente caso a una situación en que el médico demandado, en el ejercicio de la amplia discreción profesional que tiene todo galeno, le brindó a su paciente una atención médica que estaba enmarcada en los linderos de lo razonable y la cual es, aun hoy día, aceptada por amplios sectores de la profesión médica, en relación con la corrección de la cual, cuando menos, existe divergencia de criterio entre las autoridades médicas y, por último, en vista de que somos del criterio que, a lo sumo, nos encontramos ante una situación de un error de juicio, honesto e informado, por parte del médico, el cual, según nuestra jurisprudencia, no constituye base suficiente para la imposición de responsabilidad en casos de alegada impericia médica.

Por los fundamentos antes expuestos, *se dictará sentencia revocatoria de la dictada en el presente caso por el Tribunal Superior de Puerto Rico, Sala de Ponce.*

El Juez Asociado Señor Negrón García emitió opinión disidente.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Con absoluta neutralidad judicial —libres de sentimientos o simpatías naturales hacia el médico, o hacia la paciente y el niño protagonistas en este recurso— evaluamos los méritos recordando que la "asistencia del paciente *es el acto médico por excelencia y anima todas las formas de la relación y tratamiento.* Desde el punto de vista etimológico, *asistencia y asistir* provienen del latín *ad* y *sistere*, que significa *pararse, detenerse para ayudar, socorrer, estar presente. La asistencia no se agota en un acto* sino que significa

*'una serie de atenciones y prestaciones encadenadas'* y ello se consagra en una de las fórmulas de la 'Declaración de Ginebra': 'Velar, solícitamente, y ante todo, por la salud de mi paciente'". (Énfasis suplido.) Yungano-López-Poggi-Bruno, *Responsabilidad Profesional de los Médicos*, Buenos Aires, Ed. Universidad, 1982, pág. 117.

En virtud de este principio, cuya razón de ser y universalidad no se discute, nos vemos obligados a disentir de la opinión del Tribunal que revoca la sentencia del Tribunal Superior, Sala de Ponce, que declaró con lugar una demanda[1] contra el obstetra-ginecólogo Dr. Wallace Bladuell Ramos. La misma se fundamentó en impericia profesional incurrida durante el parto de la Sra. Nilda E. Pérez Torres —y los daños resultantes al menor Pedro A. Rivera Pérez valorados en $400,000, intereses por temeridad y $5,000 de honorarios de abogado— debido a una condición de cuadriplejía[2] irreversible por perlesía[3] cerebral.

## I

Según las determinaciones del foro de instancia, con apoyo en la prueba desfilada conforme un análisis de la voluminosa transcripción, el trasfondo fáctico tiene su origen en el cuarto embarazo de la señora Pérez Torres, enfermera profesional. Esperaba dar a luz en forma natural el 27 de septiembre de 1979. Su ginecólogo era el doctor De Castro. Por éste estar enfermo, el doctor Bladuell Ramos se había encargado temporeramente de atender a sus pacientes. El

---

[1] Instada a nombre de los esposos Rivera-Pérez y en beneficio del menor Pedro A. Rivera Pérez. Originalmente también fue demandado el Dr. José A. De Castro Peña. Esta acción fue desestimada. Igual suerte corrió por estar prescrita la causa de acción de los esposos Rivera-Pérez.

[2] *Cuadriplejía*: "Parálisis de los cuatros miembros." *Diccionario Terminológico de Ciencias Médicas*, 8va ed., Barcelona, Ed. Salvat, 1962, pág. 315.

[3] *Perlesía*: "Parálisis, especialmente la parálisis con temblor." *Diccionario Terminológico, op. cit.*, pág. 931.

1 de septiembre, la señora Pérez Torres fue al Hospital Santo Asilo de Damas a las 11:40 P.M., bajo la creencia de que estaba de parto. No fue así. Previo ingreso, exámenes y observación, fue dada de alta el 3 de septiembre con cita para el día 5. No asistió a ésta. Sin embargo, el 12 de septiembre acudió a su visita prenatal.

Así las cosas, el 13 de septiembre, a las 8:40 P.M. ingresó nuevamente a dicho hospital. Informó que en su hogar había roto membrana (rompió fuente) media hora antes.(4) En ese momento no tenía contracciones, pero había eliminado vaginalmente gran cantidad de líquido amniótico. Su temperatura era 36.90, pulso 84, respiración 21, presión arterial 110/80 y sonidos fetales 138 regulares. Personal del hospital notificó al doctor Bladuell Ramos de su ingreso a las 9:10 P.M.. Éste arribó al hospital y la examinó a las 9:50 P.M. Consignó que había rotura *prematura* de la membrana (*Premature rupture of the membranes*) y R.O. presentación de naglas (*R.O. breech presentation*). El galeno, además, determinó que el cuello de la matriz —que admitía un dedo— no había borrado y no tenía dilatación. A juicio suyo, no estaba de parto. Ordenó una pelvimetría radiográfica. Ésta, junto a su examen previo, le confirmó que la pelvis tenía la arquitectura y capacidad adecuadas; que el feto todavía no había encajado en la parte inferior pélvica; que se encontraba flotando con presentación de nalgas;(5) que el embarazo estaba

---

(4) Según la prueba, es un hecho indisputado que, de ordinario, desde el momento en que se rompe una membrana al parto pueden transcurrir hasta 24 horas. Véase R.C. Benson, *Diagnóstico y Tratamiento Ginecoobstétricos*, México, Ed. El Manual Moderno, 1979, pág. 659.

(5) El demandado doctor Bladuell Ramos alega que el bebé venía de *nalgas francas* (*frank breech*). Así lo atestó en su declaración. La expresión describe la situación cuando las nalgas de la criatura están hacia abajo, sus muslos flexionados sobre el vientre y las piernitas extendidas frente a su carita.

Por su parte, los demandantes sostienen que del récord médico en ningún momento surge que la criatura mostrara presentación de nalgas *francas*. Entienden que el adverbio "francas" fue añadido para minimizar responsabilidad, pues

a término, y que el peso de la criatura era de aproximadamente 6½ lbs. No había insinuación del cordón umbilical.

Ante este cuadro, a las 10:20 P.M. el doctor Bladuell Ramos se retiró a su residencia situada aproximadamente a 10 minutos del hospital. Dejó ciertas instrucciones a las enfermeras para que observaran a la paciente y le notificaran de cualquier eventualidad fuera de lo normal que ocurriera. De las anotaciones del récord clínico sólo se desprende que a las 10:30 P.M. había experimentado contracciones uterinas leves. También que las enfermeras le tomaron los signos fetales cada cierto tiempo y los anotaron.[6] A las 11:00 P.M., en ocasión de un cambio en el turno de enfermeras, el doctor Bladuell Ramos llamó para cerciorarse de que éstas conociesen sus instrucciones previas.

Transcurrió el tiempo. Entonces, a las 2:44 A.M. las enfermeras se percataron del dato importante de que los sonidos fetales habían disminuido a 120 e informaron al doctor Bladuell Ramos telefónicamente de la condición de la paciente. Ordenó su colocación en posición de *trendelenburg*. Esto conlleva "baja la cabeza de la paciente en forma boca

---

la probabilidad de prolapso del cordón umbilical en una presentación de "nalgas francas" es algo menor.

En el Récord del Hospital sometido en evidencia, que es una fotocopia, y elevado inicialmente a este Foro como parte de los autos originales, no aparecía el Informe Radiológico. Requerimos el original al Hospital. En éste se incluyó. En lo pertinente consigna: "Single fetus in frank breech presentation is observed." Anejo A, pág. 21.

[6] Los sonidos fetales normales oscilan entre 110 a 160 latidos. A las 8:40 P.M. los sonidos fetales eran 138; a las 9:15 P.M., 140; a las 9:30 P.M., 136; a las 9:45 P.M., 134; a las 10:20 P.M., 136; a las 10:30 P.M., 138; a las 11:10 P.M., 148; a las 11:30 P.M., 136; a las 12:30 A.M., 140; a las 12:45 A.M., 144; a la 1:00 A.M., 148; a la 1:15 A.M., 138; a la 1:30 A.M., 144; a la 1:45 A.M., 144; a las 2:00 A.M., 140; a las 2:15 A.M., 144; a las 2:30 A.M., 130; a las 2:44 A.M., 120; a las 2:54 A.M., 128, y a las 3:01 A.M., 128.

Las contracciones uterinas comenzaron a las 10:30 P.M. y eran leves; a la 1:00 A.M., contracciones moderadas cada 4 ó 5 minutos y continuas, y eliminaba líquido claro de la vagina; a las 2:30 A.M., contracciones moderadas cada 3 minutos, y a las 2:44 A.M., contracciones moderadas cada 3 ó 4 minutos.

arriba manteniendo elevado el resto del cuerpo, aproximadamente a 40 ó 45 grados o lo que permita la cama o camilla en que se encuentra". Además, según sus órdenes, a las 2:54 A.M. se le tomó una muestra de sangre para un análisis de "compatibilidad sanguínea cruzada" (*cross match*), cuya hoja aparece recibida en el laboratorio —según impreso en tinta por un reloj-calendario— a las 3:04 A.M. del 14 de septiembre de 1979 ("RECIBIDO 79 Sep 14 A. 3:04"). A las 3:09 A.M. la enfermera Victoriana Rodríguez Riera observó la presencia del cordón umbilical.(7) Finalmente, a las 3:10 A.M. el doctor Bladuell Ramos llegó al hospital. No encontró a la señora Pérez Torres en su habitación, sino en el pasillo de la Sala de Partos.(8) La enfermera Rodríguez Riera introducía su mano por la vagina de la paciente y le hacía presión en forma contraria al feto. De esta manera pretendía evitar se pinchara el cordón umbilical que ya había prolapsado(9) fuera de la vagina, y así lograr que no se interrumpiera el flujo de sangre y oxígeno al feto. Ante esta situación, con carácter urgente —pues antes el doctor Bladuell Ramos ni nadie había adoptado providencias para esta contigencia— dicho galeno ordenó se preparara y trasladara a la Sala de Operaciones para practicarle una operación cesárea de emergencia. Dispuso que se notificara a su residencia a la

---

(7) Al doctor Bladuel Ramos se le preguntó por qué había mandado a poner a la paciente en posición de *trendelenburg* si en ese momento supuestamente no había ocurrido el prolapso del cordón umbilical, y esa posición es indicada cuando ocurre esa complicación. En su contestación sostuvo que fue con el propósito de aliviar la presión del cuello. Sin embargo admitió que debido a la presentación de nalgas había la posibilidad de que hubiera descendido el cordón umbilical y eso fue uno de los "juicios" que consideró al ordenar tal posición. T.E., pág. 553.

(8) Desde que la enfermera llamó al doctor Bladuell Ramos y éste instruyó que colocaran a la paciente en posición de *trendelenburg*, hasta que llegó al hospital para luego ordenar que se preparara la Sala de Operaciones, *tardó 25 minutos.*

(9) *Prolapso*: "Caída o descenso de una víscera o del todo o parte de un órgano." *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 1109.

anestesióloga Dra. Alba V. Santana Sierra, y alertara al personal de dicha sala.

Bajo anestesia general le practicó la cesárea. Durante la misma, una enfermera continuó con la mano introducida en la vagina de la paciente y constantemente le informaba al médico que percibía los latidos fetales. El niño nació a las 3:39 A.M. en condiciones muy pobres.(10) Su *Índice Apgar*(11) fue de 1, sin esfuerzos respiratorios ni respuesta al estímulo raspado de la planta del pie. Su color era azul pálido, tono

---

(10) Una tardanza de más de 30 minutos aumenta la mortalidad del feto. H. Oxorn & W.R. Foote (eds.), *Human Labor & Birth*, 4ta ed., Nueva York, Appleton-Century Crofts, 1980, pág. 262. (Ciencias Médicas WQ 300 Ox IV 1980.)

Del récord se desprende que las enfermeras se percataron del prolapso del cordón umbilical a las 3:09 A.M. Evidentemente transcurrieron 30 minutos desde el prolapso del cordón umbilical hasta el nacimiento.

(11) *Índice Apgar*: Sistema desarrollado para la "valoración inmediata del recién nacido a los 1 y 5 minutos después del nacimiento es un procedimiento sistemático valioso (cuadro 36-1). El recién nacido en su mejor estado (Índice Apgar 8-10) es robusto, de color rosado y con llanto. Un lactante moderadamente deprimido (Índice Apgar 5-7) está cianótico, con respiraciones lentas e irregulares, pero tiene buen tono muscular y reflejos. El lactante intensamente deprimido (Índice Apgar de 4 o menos) se encuentra flácido, pálido o azulado, apnéico y tiene frecuencia cardiaca baja. El Índice Apgar a los 5 minutos es un indicador útil del pronóstico neonatal y a largo plazo.

Cuadro 36-1. Valoración del lactante al nacer (Índice Apgar). A los 1 y 5 minutos después del nacimiento completo del producto (independientemente del cordón y la placenta), deben observarse y registrarse los siguientes signos objetivos:

| Puntos | 0 | 1 | 2 |
| --- | --- | --- | --- |
| 1. Frecuencia | Ausente | Lento (100) | 100 |
| 2. Esfuerzo respiratorio | Ausente | Lento, irregular | Bueno llanto |
| 3. Tono muscular | Flácido | Algo de flexión de extremidades | Movimientos activos |
| 4. Respuesta al catéter, sonda en nariz (después que la orofaringe ha sido aspirada) | Ninguna | Gesto | Tos o estornudo |
| 5. Color | Azul o pálido | Rosado, extremidades azules | Rosa por completo |

Benson, *op. cit.*, págs. 763 y 764. *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762, 788 (1987).

muscular débil, con anoxia cerebral debido al prolapso del cordón umbilical, convulsiones y sepsis.

Confrontado con estos hechos, el tribunal de instancia sostuvo que la condición de cuadriplejía irreversible del niño Rivera Pérez se debió al prolapso del cordón umbilical, pues la expulsión del líquido amniótico había sido *claro*. Este dato, a su juicio, era indicativo de que el niño no había sufrido ofensas intrauterinas antes del prolapso. Concluyó:

Ante el diagnóstico de la paciente, hecho por el demandado, Dr. Wallace Bladwell [*sic*] Ramos, a las 9:50 de la noche del 13 de septiembre de 1979, en la sala de partos del Hospital Santo Asilo de Damas en Ponce, a la luz de la doctrina establecida por nuestro Tribunal Supremo de Puerto Rico, en el caso *Oliveros v. Abreu*, 101 D.P.R. 226, al efecto de cuál debe ser la norma mínima de atención médica legalmente exigible en casos de mala práctica, el médico demandado incurrió en negligencia al ausentarse del hospital luego de haber optado por la alternativa del parto por la vía vaginal y no comunicarse para saber de la paciente desde las 11:00 P.M. del día 13 de septiembre hasta que regresó a las 3:10 A.M. del próximo día respondiendo a una llamada de emergencia que le hizo la enfermera de turno. Anejo A, pág. 10.

Este dictamen se fundó en la prueba antes resumida y en el testimonio del perito de los demandantes, Dr. José A. Gratacós, quien atestiguó que, dadas las circunstancias apuntadas —donde la presentación y posición del feto era de nalgas en estación y flotaba en una madre multípara que había roto fuente— la cesárea debió haber sido realizada inmediatamente. De no hacerlo, debió entonces haberle puesto un monitor a la paciente para detectar los sonidos fetales[12] y permanecido junto a ella.

---

[12] El doctor Gratacós admitió que había otros medios alternos al monitor tales como la auscultación usando el estetoscopio o el fetoscopio. Aceptó que éste era el utilizado en aquellos lugares donde no hay monitores.

## II

Ante nos, en esencia, el doctor Bladuell Ramos cuestiona la imposición de responsabilidad, monto de la indemnización y honorarios de abogado.(13)

Concentremos primeramente en su argumento de que la práctica de la obstetricia no exige la presencia de este profesional al lado de la paciente.

La proposición es cualificable. Ciertamente, en casos normales de parto en que la paciente no ha demostrado características y factores que la experiencia refleja predisponen un parto complicado o arriesgado y la práctica no lo requiere. Aunque la presencia continua del ginecólogo sería el ideal, no podemos imponerla. Obligaría a estos especialistas a reducir notablemente el ejercicio de la profesión a la par que encarecería y aumentaría espiralmente el costo del cuidado maternal.(14) En resumen, en casos normales —sin señales que indiquen posibles riesgos— la regla es que el médico puede contar con el personal paramédico del hospital y no tiene que estar al lado de la paciente. Sin embargo, no puede perder de vista que su responsabilidad directa con toda paciente está por encima de las enfermeras y demás personal auxiliar, y que no siempre el proceso de un parto es normal.

---

(13) Sostiene que el foro de instancia erró al determinar —como cuestión de hecho y de derecho— que la norma de la profesión en la práctica de la medicina obstétrica exige la presencia continua del médico al lado de la paciente, *aun cuando ésta no esté de parto*; imponerle responsabilidad y evaluar indebidamente la prueba; resolver que las enfermeras asignadas a la Sala de Partos del Hospital Santo Asilo de Damas, por no ser obstétricas, no tenían licencia conforme la ley para ejercer como tales; conceder una cuantía de daños exagerada, y determinar que fue temerario y condenarle al pago de honorarios de abogado.

(14) Esto no significa que un médico o especialista pueda dedicarse a tratar un número ilimitado de pacientes. En esta proposición está implícita la idea de que el médico mantendrá la misma dentro de aquel número prudencial de pacientes que humana y razonablemente pueda atender eficientemente, incluso claro está, en las emergencias.

Esta práctica que judicialmente rubricamos, no exime de responsabilidad al doctor Bladuell Ramos. Expongamos las razones y su negligencia.

El doctor Gratacós admitió cualificadamente que si los hechos ocurrieron según descritos en el récord médico, él hubiese actuado según el doctor Bladuell Ramos. Le hubiese dado la oportunidad a la señora Pérez Torres de parto vaginal, ya que reunía todos los requisitos. Sin embargo, aseveró que la negligencia consistió en que el doctor Bladuell Ramos se retiró a su residencia a esperar que la paciente se pusiera de parto. Ello, como hemos transcrito, fue acogido por el tribunal. En las circunstancias particulares del caso el razonamiento es jurídicamente correcto.

Aun si se concede que al momento de ingresar al hospital la señora Pérez Torres no estaba de parto, la partida del galeno a su residencia y su regreso tardío —cuando ya había ocurrido la emergencia motivada por el prolapso del cordón umbilical— es inexcusable. El doctor Bladuell Ramos conocía las circunstancias en que venía el bebé y la existencia de unos signos que debieron advertirle que permaneciera a su lado o que estuviera real y prontamente accesible. No lo hizo a riesgo de su paciente. Debe cargar con las consecuencias de su omisión.

Para relevar de responsabilidad al doctor Bladuell Ramos, este Tribunal se apoya en los testimonios periciales de los Dres. Pedro Vicenty Vila, Paul Mari, José A. de Castro Peña y, como prueba acumulativa, Edgardo Yordán Pasarell. Según éstos, él cumplió con la norma de la práctica de la profesión, pues no era necesario ni requerido que permaneciera junto a su paciente, ya que no se encontraba de parto cuando la evaluó inicialmente. A juicio de estos peritos, la norma exigida es que las enfermeras de la Sala de Partos supervisen a una parturienta y que, según surjan cambios, informen al ginecólogo.

En cuanto a la relación de causalidad entre dicha ausencia y el prolapso del cordón umbilical, el doctor Bladuell Ramos descansa en lo afirmado por el Dr. Karlis Adamsons. Éste aseveró categóricamente que el doctor Gratacós estaba equivocado en su expresión en cuanto a la norma. Reiteró que en toda clase de parto ocurren situaciones de prolapso del cordón umbilical. Indicó que, aunque ello es conocido, en forma alguna requiere que el médico a cargo se mantenga continuamente con la paciente. Este perito afirmó que es correcto que los estudios estadísticos —según informado por la literatura médica comprendida en el texto utilizado en la enseñanza de esta materia, J.W. Williams, *Williams Obstetrics*, 15ta ed., Nueva York, Appleton-Century Crofts, 1976, págs. 667, 855—[15] demuestran que los casos de prolapso de cordón umbilical en presentación de nalgas franca son de tres a uno, en comparación con los de presentación de cabeza.

Primeramente, nos preocupa la tendencia del Tribunal de evaluar y conferir peso probatorio en casos de esta naturaleza según el número de peritos. De todos es conocido las dificultades que entraña para un reclamante lograr testimonio pericial médico en acciones de mala práctica. Al igual que en otras profesiones, incluso la de abogado, existe una renuencia natural —producto del sentimiento tribal— que milita en contra. Además, no podemos olvidar el factor económico. En litigantes de escasos recursos ello actúa como

---

[15] También señala como error que en su sentencia el tribunal de instancia utilizó citas incompletas de la obra de Williams. En específico, las citas sobre situaciones en que se justifica una cesárea como medio alterno para superar las complicaciones de una presentación de nalga (pág. 855); otra bajo *"prognosis"* (pág. 667) y una en la pág. 9 del texto *Practical Manual of Obstetrical Care*, Solicitud de Revisión, pág. 16.

Tiene razón el demandado Bladuell Ramos. Sin embargo, ello no afecta sustancialmente el análisis de negligencia. La misma está predicada, no en su decisión de darle una oportunidad a la paciente Pérez Torres para un parto vaginal, *vis-à-vis* la cesárea en ese momento, sino en haberse marchado y delegado en las enfermeras del hospital la observancia y desarrollo de este parto en particular.

obstáculo para obtener ese tipo de asesoramiento pluralista. El impacto negativo de este desbalance sobrepasa el ámbito procesal. Puede, como ocurre en este y otros casos, que la norma de excelencia profesional sobre la atención y el cuidado requeridos en la comunidad médica experimente una erosión de índole evidenciaria, fundamentada en un enfoque apelativo cuantitativo y no cualitativo de la prueba pericial. *Ríos Ruiz* v. *Mark*, 119 D.P.R. 816, 829 (1987), opinión disidente.

Segundo, no estamos ante un error de juicio médico eximente de responsabilidad. Según hemos indicado, el doctor Bladuell Ramos decidió irse a su hogar a las 10:20 P.M. luego de examinar a la señora Pérez Torres y concluir que no estaba de parto. Al tomar esta decisión, admitidamente no estaban presentes *todos* los signos clásicos de *parto inmediato*.[16]

---

[16] Estos son: (1) contracciones con regularidad, cada diez (10) minutos que persisten más de media hora en las multíparas, el cuello uterino está parcialmente borrado y el orificio cervical permite el paso de dos dedos; (2) que esté rota la bolsa de las aguas y el líquido amniótico fluya al exterior. "En la práctica puede considerarse que *tan pronto como se ha roto la bolsa de las aguas, la mujer está en pleno período de parto, tanto si existen contracciones como si éstas no se presentan*", y (3) cuando la mujer *marca*, esto es, manifiesta unos síntomas generales preliminares, tales como "palpitaciones, cefalalgias, *inquietud general*, congestión cefálica, sensación de calor, *dolores nerviosos por compresión* (casi siempre en la zona del nervio ciático, pero también en la pelvis menor), *dolores* repetidos en la *región lumbar*, pérdida de peso en los últimos días del embarazo. *Tubo digestivo*. Vómitos, diarrea, pérdida de apetito, flatulencias antes del parto, presión sobre el recto. *Órganos sexuales*. Aumento de la secreción vaginal, sensación de plenitud en la vulva. Poco antes del comienzo del parto suelen *disminuir algo los movimientos fetales*, lo cual nota claramente la embarazada y lo explica si se le pregunta.

"Todos estos síntomas preliminares no son absolutamente seguros. El más seguro es el descenso del abdomen. Por eso el tocólogo experimentado se atiene a lo que palpa, ve y oye, es decir al resultado de la exploración, a la fecha del descenso del abdomen y a la determinación de la fecha después de la última menstruación regular." W. Pschyrembel, *Obstetricia Práctica*, Barcelona, Ed. Labor, 1978, págs. 48–49.

Sin embargo, existían unos indicadores clínicos claros que, a modo de advertencias, señalaban un parto con algunos riesgos, susceptible de complicarse, a saber: (1) ruptura prematura de la membrana; (2) la posición y presentación de nalgas; (3) una multípara, y (4) con embarazo a término. W. Pschyrembel, *Obstetricia Práctica*, Barcelona, Ed. Labor, 1978, pág. 194. Nos explicamos. De acuerdo con la mejor práctica y conocimiento de la medicina, la ruptura de la bolsa de aguas es considerada como un dato de que se ha iniciado el período del parto, independientemente de las contracciones. Esto, unido a la presentación de nalgas eran factores que aumentaban la posibilidad de un prolapso del cordón umbilical. *Ello situaba a la señora Pérez Torres en la categoría de paciente de relativo alto riesgo. Como tal, su caso no podía ser atendido como uno ordinario.* Exigía unas observaciones particulares, un seguimiento cuidadoso del progreso del parto, exámenes vaginales y la presencia de su obstetra doctor Bladuell Ramos u otro especialista cualificado en el hospital o sus proximidades, de modo que se pudiera atender rápida y eficientemente la emergencia resultante del prolapso. *El mismo era un riesgo previsible.* "En su sentido usual y corriente 'prever' es ver con anticipación, conjeturar lo que ha de suceder. Es precaver, prevenir o evitar un daño o peligro. Previsibilidad, según Cabanellas, es elemento característico de la culpa, consistente en la posibilidad de prever los resultados dañosos de la acción no previstos de modo efectivo en el caso de que se trate. Requiere el precaver, adoptar las medidas de seguridad para evitar en lo posible los males reales. En sentido usual y corriente previsión, el acto de prever, es la acción de disponer lo conveniente para atender a contingencias o necesidades previsibles, o sea, atender aquello susceptible de ser previsto." (Escolios omitidos.) *Salvá Matos* v. *A. Díaz Const. Corp.*, 95 D.P.R. 902, 906–907 (1968). Aun así, el doctor Bladuell Ramos decidió

seguir el parto por vía vaginal. Descartó la cesárea. Ciertamente, para fines del análisis, aun si se respeta su juicio en ese momento, no podía dejar a su paciente al cuidado exclusivo del hospital y sus enfermeras. *Después de todo, el parto era para ser atendido por el galeno y no las enfermeras.* La norma que adjudica hoy el Tribunal suprime ese deber e invierte esas obligaciones.

Distinto a la opinión del Tribunal, al evaluar la conducta del doctor Bladuell Ramos hemos tenido presente que no estaba ajeno al potencial del peligro de que el cordón prolapsara. Según antes indicado, admitió la posibilidad de que el cordón umbilical hubiese descendido. De su conducta razonablemente se infiere que intentó *tardíamente* superar ese riesgo. Únicamente así se explica que, sin haber ocurrido esa grave complicación, al ser informado a las 2:44 A.M. de la condición de la paciente (los sonidos fetales habían descendido a 120; eliminaba líquido por la vagina, y tenía contracciones moderadas cada 4 ó 5 minutos) dicho galeno ordenó que fuera colocada en posición *trendelenburg* y, además, que se le tomara una muestra para un análisis de compatibilidad sanguínea cruzada (*cross match*). Nótese que esto último es una medida básica preoperatoria cuando se anticipa una posible transfusión de sangre, regularmente ante una cesárea. P.D. Cantor, *Traumatic Medicine and Surgery for the Attorney*, Washington, Ed. Butterworths, 1961, Vol. 5, pág. 34. Sin embargo, no ordenó que se preparara la sala de operaciones ni se convocara a un anestesista para tal eventualidad.

Aunque el momento *exacto* de la ocurrencia de un prolapso del cordón umbilical es difícil de anticipar —distinto a la opinión del Dr. Karlis Adamsons en que descansa esencialmente el dictamen de este Tribunal— las autoridades médicas reconocen ciertos indicadores que ponen sobre aviso, y la adopción, como medida previsora y cautelar, de la cirugía de cesárea. A tal efecto, como factores combinados predisponentes —que llaman la atención y aumentan notablemente el

riesgo del prolapso del cordón umbilical— se aceptan la ruptura prematura de las membranas en una multípara, con posición y presentación de nalgas, en un embarazo a término. W. Pschyrembel, *op. cit.*, pág. 194; Williams, *op. cit.*, págs. 1012–1044. La interrelación entre estas condiciones es evidente. Cuando la bolsa está rota incrementa la posibilidad del prolapso. Implica un pronóstico desfavorable para el feto, pues ocasiona sufrimiento fetal agudo. R.C. Benson, *Diagnóstico y Tratamiento Ginecoobstétricos*, México, Ed. El Manual Moderno, 1979, pág. 765. Si excede por más de cinco (5) minutos —sea la oclusión completa o parcial— seguramente ocasionará su muerte (de 35% a 50%) o una lesión importante al sistema nervioso central. La cuestión requiere tratamiento de emergencia, poniéndose a la paciente en posición de *trendelenburg* y, como remedio heroico temporal, ejercer presión manual hacia arriba a través de la vagina para levantar y mantener la parte de presentación alejada del cordón prolapsado. *No se debe demorar el parto.* Si no es favorable vaginalmente debe recurrirse a la operación cesárea de urgencia. H.W. Berner, *The Placenta—Part II*, 1971 Med. Trial Tech. Q. 446–447 (1971); Cantor, *op. cit.*, pág. 32.

## III

El doctor Bladuell Ramos corrió el riesgo de que en su ausencia la paciente Pérez Torres presentara un cuadro de emergencia —como en efecto ocurrió— y no pudiera regresar rápidamente y a tiempo al hospital para remediarlo. ¿De qué valor profesional sirvió a su paciente tener su residencia a 10 minutos del hospital? ¿Cómo justificar que desde que fue notificado inexplicablemente se tardó 25 minutos en arribar? La situación es más grave. ¿Cómo excusar esa dilación, si a la misma añadimos que debido *a la falta de preparativos para la cirugía*, transcurrieron *otros* 30 minutos desde que

se prolapsó el cordón a las 3:09 A.M. y nació el bebé a las 3:39 A.M.? El inventario final de esta falta de previsión es que su ausencia y tardanza rompió un eslabón esencial en la prestación y asistencia médica primaria y continua que contribuyó *directamente* a que el nacimiento del niño se realizara *media hora más tarde* de haberse prolapsado el cordón. Como resultado, a la fecha del juicio, a los cuatro (4) años, el niño Pedro A. "no camina, no habla; no puede ni siquiera arrastrarse, no puede sostener el biberón, no se sienta, no controla la eliminación de feces ni de orina". Anejo F, pág. 84. El diagnóstico inicial de "encefalopatía anóxica con daño cerebral permanente, hoy en día es de cuadriplejía irreversible por parálisis cerebral espática". Anejo F, pág. 84.

Recapitulamos, el peculiar trasfondo fáctico del caso justifica la conclusión de negligencia del doctor Bladuell Ramos. Al éste optar por irse a su residencia, dejar a la paciente Pérez Torres al cuidado de las enfermeras y, sobretodo, demorarse irrazonablemente en regresar una vez notificado de la situación, incurrió en un abandono constructivo. T. Mains, *Medical Abandonment*, 1985 Med. Trial Tech. Q. 307 (1985). *Esa práctica rutinaria no procedía, en vista de que la combinación de factores aludidos aumentaban los riesgos de un prolapso del cordón umbilical.* "Si est[aba] imposibilitado de brindar personalmente tal atención por otros quehaceres válidos de la profesión o razones personales de peso, su obligación e[ra] buscar [un] médico competente [que] lo sustituy[era]. Crawford & Moritz, *Doctor and Patient and the Law. . . ." Núñez* v. *Cintrón*, 115 D.P.R. 598, 615 (1984).

La norma del Departamento de Salud con respecto a que "[c]ada paciente será atendida por un médico autorizado a practicar su profesión en Puerto Rico, *quien podrá delegar aquella parte del cuidado que juzgue conveniente en una o varias enfermeras o comadronas*" (énfasis suplido), 24 R.&R.P.R. sec. 18–121(a), no significa que este profesional pueda delegar funciones y atributos que son de su exclusiva

responsabilidad. Si así fuera, ¿qué utilidad profesional y social tendrían en cualquier época los obstetras ginecólogos?

En términos de la buena práctica de la medicina, no exponemos una norma absoluta ni resolvemos que en la asistencia al paciente un médico tiene que permanecer siempre, y en todo momento, junto al mismo. En el descargo de su responsabilidad, tiene amplia laxitud para ejercitar su criterio informado a la luz del cuadro clínico que posee al momento de adoptar su decisión con proyección futura. Simplemente sostenemos que, en aquella época —en este caso en particular y en la forma en que acontecieron los hechos— la buena práctica de la medicina requería lo contrario. "El abandono del paciente por el obstetra es un medio legal de imputarle al médico que no estaba presente durante el parto." (Traducción nuestra.) B.J. Ficarra, *Surgical and Allied Malpractice*, Illinois, Charles C. Thomas, 1968, pág. 416.

## IV

Una vez demostrada la negligencia del doctor Bladuell Ramos, con el beneficio de la mirada retrospectiva, podemos válidamente reproducir las siguientes expresiones orientadoras de la trayectoria de vanguardia que actualmente se perfila sobre este asunto:

La negligencia en la práctica de la obstetricia ha dejado a este país un legado de niños con lesiones cerebrales. Un número sustancial de obstetras aún utiliza prácticas de la medicina que están obsoletas. Al considerar el número de infantes que nacen producto de embarazos a término, se ha estimado que entre un 20 a 30 por ciento de los niños en los Centros de Perlesía Cerebral a través de Estados Unidos fueron víctima de una crasa práctica negligente de la obstetricia. El problema es alarmante, y el número de niños lesionados médicamente es asombroso.

La práctica negligente de la obstetricia toma muchas formas; esto incluye, pero no se limita, a la omisión de llevar un registro (*monitor*) del embarazo, parto y nacimiento; el uso

imprudente de drogas que estimulan el parto; la omisión de diagnosticar y responder a circunstancias de un embarazo o nacimiento de alto riesgo; nacimientos post-fechados (*post-datism*), y nacimientos traumáticos. Hasta hace poco, los obstetras, rutinariamente, se dedicaban a recibir los bebés mediante parto natural (*baby-catching*). O sea, el médico no se aparecía en el hospital a atender su paciente hasta momentos antes del nacimiento. En tales circunstancias, era imposible evaluarla adecuadamente, identificar los problemas y actuar prudentemente de modo que se asegurara el nacimiento de un recién nacido viable. Los efectos nocivos reconocidos de estas prácticas motivaron al Colegio Americano de Obstetras y Ginecólogos a adoptar la política (*policy*) de que esos procedimientos ya no eran aceptables. Lamentablemente, como se permite que los médicos se supervisen a sí mismos, es un hecho que al presente persiste la práctica de recibir los bebés mediante parto natural.

Los obstetras todavía creen que la paciente tiene que ajustarse a su horario. Sin embargo, por lo general ocurre lo contrario. Se cometen muchos errores y se producen lesiones como resultado de esta errónea noción de que la paciente debe ajustarse al horario del médico. Algunas veces ocurre que la falsa alarma se convierte en una emergencia. Por lo tanto, en muchas circunstancias la falsa alarma puede culminar en un niño lesionado. Llamar *rutina* a la obstetricia es hacer referencia al hecho de que el 95 por ciento de todos los nacimientos pueden ser atendidos por cualquier médico. Es el 5 por ciento de los nacimientos que en sí conlleva riesgos para los cuales se necesitan las destrezas (*expertise*) del obstetra. Tal vez menos del 1 por ciento de los llamados casos de *alto riesgo* son identificados antes de que la paciente comience el parto. Estos casos deberán ser atendidos en los centros de cuidado especiales (*tertiary*).

Del restante 4.5 por ciento de nacimientos, el obstetra nunca sabe qué número del 100 por ciento de las pacientes caerá en la categoría de alto riesgo. Esta categoría consiste de problemas que se desarrollan en el período perinatal, ya sea durante el parto, nacimiento o el período neonatal. Los casos de obstetricia no pueden considerarse como una rutina. El

médico que diga, *"llámeme cuando ella esté lista"*, potencial-
mente, está preparando una circunstancia que puede trágica-
mente culminar en un niño con daño cerebral. Al médico
debería requerírsele estar presente en la Sala de Partos, para
asegurar su disponibilidad cuando la paciente esté de parto.
El riesgo en que se pone a la paciente debido a la inhabilidad
del médico para estar presente, claramente es una circunstan-
cia previsible. Uno de los errores más comunes en obstetricia
es la ausencia del obstetra durante el parto o nacimiento. Mu-
chas de las tardanzas dejan a la madre y al bebé en peligro. Si
el médico no está presente, él o ella no pueden determinar si el
niño está en peligro fetal ni el método de parto que se utili-
zará. (Traducción nuestra.) M.D. Volk y M.D. Morgan, *Medi-
cal Malpractice Handling Obstetric and Neonatal Cases*,
Nueva York, McGraw-Hill Book Co., 1986, págs. *V–VI*.

Distinto a nuestra decisión en *Riley* v. *Rodríguez de Pa-
checo*, supra, la de hoy no sólo refrenda una práctica laxa y
pobre de la medicina, sino injusta. Al igual que ayer, la re-
chazamos. La profecía comienza a cumplirse. *Ríos Ruiz* v.
*Mark*, supra.

