Córdova Arone, Juez Ponente
*1154 TEXTO COMPLETO DE LA SENTENCIA
Mediante recurso de apelación presentado ante este Foro el 14 de agosto de 1997, los apelantes, el Sr. Luis A. Colón Otero y otros, solicitan que se revoque la sentencia dictada por el Tribunal de Primera Instancia, Sala de Bayamón, el 4 de abril de 1997. La referida sentencia desestimó la demanda de epígrafe.
Por los fundamentos que pasamos a exponer procedemos a confirmar la sentencia emitida por el foro apelado.
I
De las determinaciones de hechos ante el Tribunal de Primera Instancia se desprende que la Sa. Iris Nereida Rivera Figueroa, (Sa. Rivera), de veinticuatro (24) años de edad, fue admitida al Hospital Regional de Bayamón Dr. Ruiz Arnau (Hospital), el día 29 de septiembre de 1992, por tener aproximadamente 42 y 2/7 semanas de gestación. A la fecha de su hospitalización había tenido cinco partos vaginales y todos los bebés habían sido de alto peso, excepto uno.
En el día señalado, la Sa. Rivera ingresó al Hospital alrededor de las 10:45 de la mañana y los exámenes efectuados revelaron que tenía un centímetro (1 cm), de dilatación cervical, presentación fetal de cabeza, flotando, membranas intactas y latidos fetales (F.H.R). de 140 por minuto (140/m). Los exámenes subsiguientes demostraron que el parto no estaba progresando adecuadamente pero nada fuera de los linderos de normalidad.
El 30 de septiembre de 1992 a las 9:25 A.M., es decir, 24 horas después de haber sido admitida la paciente, la especialista de turno, Dra. Delma Negrón, llegó al Hospital a hacer su trabajo de evaluación de los casos admitidos a sala de partos y las enfermeras de turno la llevaron inmediatamente donde se encontraba la Sa. Rivera, por estar preocupadas por su caso. La evaluación que efectuó la doctora demostró una decelaración de los latidos fetales de hasta 60/mi.
En vista de lo prolongado del parto, la deceleración de los latidos fetales y de que el peso fetal calculado era de nueve libras, la Dra. Negrón decidió realizar un parto por cesárea por considerar que la vida del feto estaba en riesgo. Comenzó la operación cerca de las 10:30 A.M. bajo anestesia espinal y poco después nació un varón.
El día siguiente que se efectuó la cesárea, se le ofreció asistencia de aseo a la Sa. Rivera, quien se encontraba alerta, con el pulso y presión sanguínea normal y sin complicaciones. Minutos después, a las 8:55 de la mañana, ésta comenzó a convulsar y a pesar de esfuerzos de resucitación por personal del hospital, sufrió un paro cardio-respiratorio que resultó en su deceso. Su bebé, a quien llamaron Rey Francisco, estuvo hospitalizado por diez (10) días a causa de pulmonía y fue dado de alta el 10 de octubre de 1992.
El Sr. Luis Colón Otero, esposo de la occisa, y otros, presentaron una demanda contra el Estado Libre Asociado de Puerto Rico (E.L.A). y la Universidad Central del Caribe, ante el foro de instancia. Alegaron que de haberse brindado a la Sa. Rivera aquella atención médica de acuerdo a las exigencias profesionales generalmente reconocidas en la profesión médica, su condición no habría degenerado en el fallecimiento de ella y tampoco en la pulmonía que sufrió la criatura.
El foro de instancia dictó sentencia desestimando la demanda por razón de que "la parte demandante no logró establecer, con preponderancia de la prueba, que el personal del Hospital se desvió de las normas de conocimiento y cuidado médico aplicables a los cuidados ginecológicos de *1155 parto o que la muerte de la Sa. Rivera y el hecho de que el bebé sufriera una pulmonía fue a causa de la prolongación negligente del parto."
Inconformes, el Sr. Colón y otros presentaron una oportuna solicitud de apelación ante este foro. Por los fundamentos que pasamos a exponer procedemos a confirmar la sentencia del foro apelado.
II
En su recurso de apelación señala el Sr. Colón que erró el Tribunal de Primera Instancia al concluir que la parte apelante no logró establecer que el personal del Hospital se desvió de las normas de conocimiento y de cuidado médico aplicables a los cuidados ginecológicos de parto que se le ofrecieron a la Sa. Rivera y que la causa de su muerte se debió a la prolongación del parto por negligencia médica. Como segundo error señala que incidió el foro apelado al concluir que la parte apelante no logró establecer que el personal del Hospital se desvió de las normas de conocimiento y de cuidado médico aplicables a los cuidados ginecológicos de parto que se le ofrecieron a la Sa. Rivera y que causaron que el bebé sufriera una pulmonía.
Por ser los alegados errores realmente uno, (la prolongación negligente del parto), los trataremos de esa forma y se discutirán como uno.
Consideramos como probados los hechos expuestos en la Exposición Narrativa de la Prueba, ya que los mismos fueron estipulados. Estos coinciden con las determinaciones de hechos de la sentencia.
III
Nuestro ordenamiento exige que un médico responda por los daños y perjuicios causados tan sólo cuando actúa negligentemente, con descuido o falta de la pericia profesional que exigen las circunstancias. Ríos Ruiz v. Mark, 119 D.P.R. 816 (1987), a la pág. 820. Por lo tanto, para determinar si éste incurrió o no en responsabilidad civil por omisión, los factores a considerar serán la existencia o inexistencia de un deber jurídico de actuar- por parte del alegado causante del daño cuyo incumplimiento constituye antijuricidad, y si de haberse realizado el acto omitido se habría evitado el daño. Monllor Arzola v. Sociedad de Gananciales, _ D.P.R. _ (1995), 95 J.T.S. 77, a la pág. 960.
La norma mínima de cuidado médico exigible legalmente en casos de impericia en Puerto Rico, al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, es aquella atención que a la luz de los modernos medios de comunicación y enseñanza y conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, satisfacen las exigencias generalmente reconocidas por la profesión. Ríos Ruiz, supra, a la pág. 820.
Expresó el Tribunal Supremo en Hilda A. Ramos Robles v. Dr. José A. García Vicario y otros, _ D.P.R. _ (1993), 93 J.T.S. 167, a la pág. 11397, que al evaluar la actuación de un médico no podemos olvidar que a éste lo acompaña una presunción al efecto de que ha ejercido un grado razonable de cuidado y el tratamiento fue uno adecuado. El hecho de que un paciente haya sufrido un daño o que el tratamiento no haya tenido éxito no crea ninguna presunción de negligencia por parte del médico. Para rebatir esta presunción, la parte demandante no podrá descansar en una mera posibilidad de que el daño se debió al incumplimiento del médico de su obligación profesional. Ello requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura. Vease además, Rodríguez Crespo v. Hernández, 121 D.P.R. 639 (1988), a la pág. 650.
En el caso de Leticia Castro Ortiz, etc. v. Municipio de Carolina y otros, _ D.P.R. _ (1994), 94 J.T.S. 17, a la pág. 11529, nuestro más alto Foro expresó que la jurisprudencia sobre impericia médica exige que el actor demuestre, mediante preponderancia de la prueba, que la conducta negligente del demandado fue el factor que con mayor probabilidad lo causó. Ello es así, toda vez que en estos casos existe una presunción de que el médico le brindó un tratamiento adecuado al paciente, lo que le impone al demandante la obligación de rebatir dicha presunción a través de la presentación de prueba suficiente en contrario. Rodríguez Crespo v. Hernández, supra, a la pág. 649.
Al médico se le reconoce una amplia discreción en el cuidado de un paciente. En ese sentido, un médico no incurre en responsabilidad si el tratamiento que le brinda a su paciente, aun cuando *1156 erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica; constituyendo defensa válida para el médico demandado la existencia de divergencia de criterios entre las autoridades médicas sobre si el tratamiento o procedimiento en particular era correcto bajo las circunstancias del caso. Pérez Torres v. Bladuell Ramos, 120 D.P.R. 295 (1988), a la pág. 303.
Para establecer una caso prima facie de daños y perjuicios por alegada mala práctica en la medicina es necesario que el demandante presente prueba satisfactoria sobre; (1) las normas mínimas de conocimiento y cuidado médico aplicables a los generalistas o a los especialistas, y (2) la relación causal entre la actuación u omisión del facultativo y la lesión sufrida por el paciente y (3) que ésta fue la causa de la lesión sufrida por el paciente. Medina Santiago v. Vélez, 120 D.P.R. 380 (1988) a la pág. 385.
En Pérez Torres v. Bladuell Ramos, supra, a las págs. 297-298, el Tribunal Supremo expresó que las acciones por alegada impericia médica constituyen o representan un reto especial para los jueces por razón de que los mismos siempre versan sobre la ocurrencia de un daño; que, por lo general, resulta impresionante y doloroso. No obstante el sentimiento natural de compasión que todo ser humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, los jueces tienen que mantener siempre presente que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo.
IV
Durante el juicio, la Dra. Negrón, doctora en medicina con especialidad en Obstetricia y Ginecología, testificó como perito de ocurrencia, ya que fue ella quien realizó la cesárea a la Sa. Rivera. Estudió e investigó el historial del caso, además, examinó los informes médicos y del hospital. Declaró que el hecho de que una mujer tenga 42 y 2/7 de semanas de embarazo de por sí se considera un factor de alto riesgo. Por eso, al ser admitida a la institución hospitalaria se efectuaron varios exámenes médicos durante ese día. Los mismos demostraron que el parto no estaba progresando.
Añadió que el mismo día de su admisión, alrededor de las 4:45 de la tarde, un médico especialista que atendió a la paciente rompió el saco amniótico con el propósito de estimular el parto. Del récord médico se desprende que hubo salida de líquido amniótico, pero como el parto no progresó, se le administró oxitocina a la Sa. Rivera para estimular el parto artificialmente. Durante el juicio, la Dra. Negrón expresó que los médicos que examinaron a la Sa. Rivera durante la noche o en la madrugada del día siguiente al día de su admisión, debieron haber operado a la paciente para evitar que continuara aumentando la morbilidad tanto materna como fetal.
Añadió a su testimonio que la cabeza del bebé estuvo presionando el área periuterina durante un período de tiempo sumamente prolongado; más de lo que se considera razonable y que al bebé lo debieron sacar mucho antes por la amenaza del compromiso fetal a causa de lo prolongado del parto activo. Atestó que la paciente en ningún momento siguió el patrón característico de un parto normal y que habían transcurrido muchas horas. Consideró que en este caso, no hubo un buen manejo obstétrico y tampoco una intervención activa.
Durante el contrainterrogatorio expresó que las órdenes post operatorias fueron las de rutina con excepción de que ordenó antibióticos, que usualmente son opcionales y añadió que luego de examinar a la paciente, no había preocupación especial en cuanto a su condición, excepto los riesgos usuales de hemorragias, infecciones intrauterinas y tromboflevitis. Reconoció que cuando terminó la cesárea no podía prever que la paciente iba a embolizar súbitamente al día siguiente y que por razón de ser la paciente una mujer joven, no tenía esa preocupación. Finalmente confirmó que el bebé había nacido en buen estado. En ningún momento testificó a los efectos de que si la cesárea se hubiera efectuado antes, el riesgo de una embolia y paro cardio-respiratorio o la condición del bebé hubiera sido menor.
Por otro lado, el perito presentado por el Hospital, el Dr. Ricardo Antonio Moscoso Moscoso, obstetra-ginecólogo, declaró haber evaluado el reporte relacionado a la hospitalización de la Sa. Rivera y del recién nacido con fecha del 29 de septiembre al 1ro. de octubre de 1992. Además, examinó copia de la demanda, copia del resumen del caso emitido por el Dr. Blas Santa María, copia del Informe Pericial de la Dra. Norma Villanueva, copia del Récord Prenatal y literatura médica *1157 relacionada a cesáreas y embolias pulmonares.
Su testimonio confirmó que el feto tenía una presentación de cabeza con latidos de 140/mi y confirmó además lo expresado en cuanto al progreso del parto.
El tribunal cuestionó porque no se intervino quirúrgicamente antes, en vista de que el parto no progresaba y considerando que la paciente había sobrepasado el término normal de gestación por sobre dos semanas. El Dr. Moscoso respondió que esa determinación depende del criterio del médico respecto a si la paciente ha estado o no de parto activo. Declaró que para arribar a la decisión de hacer una cesárea o permitir que el parto progrese depende del historial obstétrico de la paciente, partos previos, y problemas obstétricos anteriores, entre otros. Declaró que en el caso de la Sa. Rivera no se había reportado nada relacionado a posibles complicaciones.
En cuanto a la deceleración de los latidos fetales o bradicardia, afirmó que tan pronto se registró la condición se tomaron las medidas usuales para mejorar la condición del feto y que las mismas remediaron la situación, ya que la condición no volvió a registrarse. Declaró que la paciente debió haber estado completamente dilatada para las 7:20 A.M. del 30 de septiembre y que al no estarlo, se le debió haber hecho la cesárea en ese momento. Añadió que no fue hasta las 10:30 A.M. que se efectuó la misma, sin complicaciones, con un sangrado normal y el bebé en buen estado.
Atestó que la paciente continuó estable y que no hubo necesidad de tomar medidas especiales con ella y así continuó hasta el día siguiente, el 1ro de octubre de 1992, cuando fue examinada y se encontraba alerta, comunicativa y sin quejas. Sus signos vitales se podían considerar normales. Pocos minutos después comenzó a convulsar, y a pesar de esfuerzos para resucitarla, ésta falleció.
Declaró que la embolia pulmonar fue la causa de la muerte de la paciente, y que dicha condición no estaba relacionada de manera alguna con la atención médica recibida por la Sa. Rivera. Afirmó que no existía evidencia o historial previo relacionado a embolias, episodios de tromboflevitis o alguna otra condición relacionada.
Añadió que si bien es cierto que la embolia pulmonar es un riesgo poco usual, el mismo está enumerado como uno de los riesgos, pero no está atado al factor tiempo. El riesgo de una embolia aumenta cuando la paciente está postrada en cama y aunque la cesárea se hubiera efectuado antes, la condición resultante en la salud de la madre y del bebé sería la misma, ya que el riesgo mayor era la operación de cesárea. Opinó que si se hubiera esperado más tiempo el parto quizás habría progresado naturalmente evitándose así el riesgo que conlleva una cesárea.
En su informe pericial añadió que después de una cesárea existe un riesgo de que una mujer sufra un desorden tromboembólico de 3 a 5 veces más alto de que ocurra después de un parto vaginal. En su opinión, la muerte de la Sa. Rivera no fue causada por la negligencia del personal que estuvo a su cargo durante el proceso del parto y el post parto, sino que fue debido a la acumulación de varios factores que predisponen la formación de trombos y que esto no era previsible.
y
Como señalamos anteriormente, para que un médico responda por los daños y perjuicios causados por impericia es necesario que se demuestre que el daño causado fue el resultado directo de la omisión del médico, su falta de pericia o su descuido. La norma mínima exigible en cuanto al cuidado médico es aquella que a la luz de los modernos medios de comunicación y enseñanza y la práctica prevaleciente de la medicina, satisface las exigencias de la profesión.
La parte demandante deberá demostrar con preponderancia de la prueba que el daño resultante fue producto del incumplimiento de la obligación profesional del médico y que ese incumplimiento causó el daño sufrido. Se exige además que se demuestre que de haber actuado el médico habría evitado el daño.
En el caso de autos es evidente que a pesar de que la Dra. Negrón consideró que el manejo de la paciente no fue uno agresivo, del récord se desprende que con frecuencia la paciente era evaluada por el personal del hospital, incluyendo médicos especialistas. Ella había tenido cinco (5) partos *1158 anteriormente y todos habían sido vaginales. No existía en el récord de ingreso o su historial médico evidencia alguna de complicaciones o problemas anteriores en el embarazo que apuntaran a que debían tomarse precauciones extraordinarias con la paciente. De hecho, la operación fue una ordinaria y después de la cesárea ella y su bebé se encontraban estables.
En horas de la tarde del mismo día en que se llevó a cabo la cesárea, la paciente se encontraba alerta y comunicativa. Asimismo las anotaciones en el récord médico del día 1ro de octubre de 1992 a las 8:30 reflejan que la paciente estaba alerta y sin quejas. Pocos minutos después la Sa. Rivera falleció de una embolia pulmonar.
Finalmente debemos añadir que la prueba pericial evidenció que la incidencia de trombosis aumenta en los pacientes post parto, con relación a la incidencia de trombosis antes del parto. La embolia pulmonar asociada con el embarazo se considera una de las causas más comunes de muerte post parto, pero no está relacionada a causas obstétricas.
VI
Nuestro análisis nos ha llevado a la conclusión forzosa de que la muerte de la Sa. Rivera no fue causada por la negligencia del personal del Hospital que intervino con ella. En particular, hemos repasado innumerables veces las opiniones y conclusiones de la Dra. Negrón y a pesar de que afirma que la cesárea debió haberse efectuado antes, su testimonio de manera alguna controvierte el testimonio del Dr. Moscoso, ya que no establece clínicamente que el embolismo fue como resultado de la dilación en efectuar la cesárea o que el riesgo fuese mayor debido a esa dilación.
En cuanto al bebé, a pesar que de la prueba se desprende que experimentó dificultades respiratorias y se le diagnosticó una pulmonía bilateral que resultó en su hospitalización por diez días con antibióticos, resolvemos que tampoco pudo establecerse con preponderancia de la prueba que su condición fue producto de que no se efectuara la cesárea antes.
Concurrimos con las conclusiones que hiciera el tribunal apelado referentes a que el Sr. Colón y otros no lograron establecer con preponderancia de la prueba que el tratamiento practicado a la paciente no fue el generalmente reconocido por la profesión o que el manejo tanto de la Sa. Rivera o su bebé fuera uno negligente. Es decir, no pudo establecerse la relación de causalidad entre el daño y el acto culposo o negligente como lo exige nuestro ordenamiento. Por el contrario, la prueba demostró que la embolia pulmonar fue la causa del fallecimiento de la Sa. Rivera, y que dicha condición no era predecible o anticipable de acuerdo a su condición, historial previo y las circunstancias existentes en el caso de autos.
Por los fundamentos anteriormente expuestos se confirma la sentencia apelada.
Así lo acordó el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General