Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| EDGARDO FELICIANO SANTIAGO<br><br>Apelante<br><br><br>V.<br><br><br>HOSPITAL DOCTOR SUSONI y otros<br><br>Apelado | KLAN202401143 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Arecibo<br><br>Caso Núm.: AR2022CV01291<br><br>Sobre: Impericia Médica |

Panel integrado por su presidente, el Juez Rivera Colón, la Jueza Santiago Calderón y la Juez Lotti Rodríguez.[1]

Lotti Rodríguez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 7 de agosto de 2025.

Comparece el Sr. Edgardo Feliciano Santiago (señor Feliciano Santiago o "parte apelante"), mediante un recurso de apelación solicitando que revoquemos la *Sentencia* emitida el 7 de noviembre de 2024, notificada al siguiente día, por el Tribunal de Primera Instancia, Sala Superior de Arecibo (TPI). Mediante el referido dictamen, el foro primario concluyó que el señor Feliciano Santiago no logró establecer su caso con preponderancia de prueba. Por ello, declaró Con Lugar la *Moción de Non Suit* promovida en corte abierta por la parte apelada a tenor con la Regla 39.2(c) de Procedimiento Civil, 32 LPRA Ap.

**I.**

El 20 de julio de 2022, el señor Feliciano Santiago presentó la demanda de epígrafe por alegada impericia médica en contra del Dr. Juan E. Figueroa Torres (Dr. Figueroa), Hospital Doctor Susoni y el

---

[1] Conforme la OATA-2025-078 del 14 de mayo de 2025, se asignó a la Juez Glorianne M. Lotti Rodríguez, en sustitución del Hon. Nery E. Adames Soto.

Número Identificador

SEN2025 _____

Dr. José Mattei Díaz (Dr. Mattei).[2] Alegó, en esencia, que el 3 de enero de 2022 acudió a la Sala de Emergencia del Hospital Doctor Susoni debido a una herida en el talón del pie derecho. Allí, el Dr. Figueroa documentó en el expediente médico que el señor Feliciano Santiago tenía una úlcera con tejido necrótico y secreciones en el talón derecho. Indicó que posteriormente fue atendido por el podiatra, Dr. Mattei, quien dio de alta al apelante con cita de seguimiento en su oficina privada el 12 de enero de 2022. Sostuvo que diez (10) días más tarde regresó a la Sala de Emergencia, y fue diagnosticado con una infección severa en el talón del pie derecho. Alegó, que, en consecuencia, se le amputó la pierna derecha por debajo de la rodilla. Asimismo, solicitó el pago de una suma ascendente a $1,000,000.00 por concepto de daños y perjuicios contra la parte demandada.

Luego, el 4 de agosto de 2022, el apelante presentó una *Demanda Enmendada* en la que incluyó a Emergency Physician Providers, LLC.[3] Por su parte, el Dr. Figueroa Torres y el Hospital Doctor Susoni, Inc., presentaron su *Contestación a Demanda Enmendada.*[4] En cuanto a los referidos codemandados, el TPI dictó *Sentencia Parcial* por el desistimiento del señor Feliciano Santiago. Posteriormente, el Dr. Mattei y Emergency Physician Providers, LLC, (en conjunto "los apelados") presentaron su *Contestación a Demanda Enmendada.*[5]

Así las cosas, el 28 de agosto de 2023, las partes presentaron el *Informe de Conferencia con Antelación a Juicio.*[6] El día después, el apelante presentó su *Segunda Demanda Enmendada*, de la cual el Dr. Mattei y Emergency Physician Providers, LLC presentaron su

---

[2] Anejo I del *Recurso de Apelación,* págs. 1-5.
[3] Anejo II del *Recurso de Apelación,* págs. 6-10.
[4] Anejo III y IV del *Recurso de Apelación,* págs. 11-30.
[5] Anejo V y VI del *Recurso de Apelación,* págs. 31-40.
[6] Anejo VIII del *Recurso de Apelación,* págs. 42-83.

contestación. Finalmente, el Juicio en su Fondo se celebró de forma presencial los días 15, 16 y 17 de octubre de 2024.

Como parte del desfile de prueba testifical del señor Feliciano Santiago, el TPI tuvo ante sí el testimonio del Dr. Edwin Miranda Aponte (Dr. Miranda o perito), el Dr. Figueroa y del mismo apelante. Allí, el perito explicó las razones por las que el apelante no debió haber sido dado alta conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina. Sostuvo, en específico, que el tratamiento adecuado debió ser el siguiente:

> La glucosa, que la prueba capilar estaba, —la inicial—, en 500, se confirmó con una prueba de serología cuantitativa, que aún después de administrar insulina de forma parental, persistía elevada en 392 miligramos por decilitro. Eso requería administrar líquidos intravenosos de forma agresiva, más de 100 mililitros por hora. Administrar insulina y hacer pruebas capilares y continuar manejando el paciente estabilizarlo. Incluso, una consulta a un endocrinólogo y una bomba de infusión de insulina. [...] Por lo tanto, esa es la primera indicación absoluta de la hospitalización, procurar el control de la azúcar para propiciar el control de la infección.

> En segundo lugar, hacer cultivos bacteriólogos. Aunque no hay señalamientos con la selección de la antibioterapia empírica que hizo el médico de emergencia, el Cleocin y el Levaquin, que eso está correcto, había que determinar con un preliminar en 48 horas los resultados de ese cultivo, para confirmar con el antibiograma que era efectivos y que la cepa de esos microbios no era resistente. Esto conlleva, por seguridad del paciente una admisión de por lo menos *short admission* a ver si eso se puede hacer en ese término de tiempo.

> Tercero, erradicar el foco de infección. Tejido desvitalizado, necrótico, impide el tejido de granulación que se procura de que haya para una cicatrización por segunda intención de úlcera. Si uno deja tejido podrido, muerto, es imposible que esa úlcera cicatrice. Hay que removerla. Por lo tanto, había que hacer una escisión quirúrgica, sino quirúrgica, remover ese foco infeccioso para propiciar también el control de azúcar.

> [Igualmente, se] identificaron varios electrolíticos, que había que corregir. Eso es parte de la estabilización de un paciente y verificar a ciencia cierta que, con las medidas terapéuticas, esos electrolitos iban a llegar de nuevo a sus valores normales, que posiblemente estaban propiciados por el descontrol de azúcar y el estado hemodinámico errático que tenía el paciente para el momento de la intervención del Dr. Mattei. Eso

toma tiempo y hay que hacerlo en un hospital, no se puede hacer de forma ambulatoria.[7]

Finalizado el desfile de prueba por la parte demandante y sometido su caso, los demandados, Emergency Physician Providers, LLC y el Dr. Mattei presentaron en corte abierta una solicitud de desestimación al amparo de la Regla 39.2 (c) de Procedimiento Civil. En síntesis, la demandada Emergency Physician Providers adujo a que hubo total ausencia de prueba para demostrar lo alegado en la demanda sobre la negligencia de dicha entidad al no asignar facultativos médicos una vez el Dr. Figueroa salió de turno. Expuso que de la prueba desfilada y la documentación admitida en evidencia surge que el Dr. González Arce fue el médico que atendió al demandante luego de que el Dr. Figueroa saliera de su turno a las 4:00 p.m. Asimismo, adujo que hubo ausencia de prueba para demostrar que el Dr. Mattei era empleado o prestara servicios para Emergency Physician Providers. Por otro lado, planteó que, del propio testimonio del perito de la parte demandante, se expresó que este no tenía ninguna observación o señalamiento en contra de dicha codemandada.

Por su parte, el codemandado Dr. Mattei argumentó que la parte demandante falló en no presentar prueba sobre cuál era el estándar de medicina de la especialidad en controversia; cual o cuales de dichos estándares fueron quebrantados y la relación causal con los daños alegados por el demandante.

Luego de escuchado los argumentos de las partes, el TPI declaró Ha Lugar la solicitud de desestimación al amparo de la Regla 39.2(c) de Procedimiento Civil, *supra.* Esto, ya que luego del apelante haber presentado su prueba en juicio, el TPI entendió que los hechos

---

[7] Transcripción de la Prueba Oral (TPO) del Juicio en su Fondo del 15 de octubre de 2024, págs. 180-182.

probados hasta ese momento y la ley, el demandante no tenía derecho a la concesión de remedio alguno.

El 7 de noviembre de 2024, y notificada al siguiente día, el foro primario dictó *Sentencia*, mediante la cual se desestimó la demanda de epígrafe bajo la precitada regla de Procedimiento Civil.[8] El Tribunal concluyó que el apelante no logró establecer el nexo causal con preponderancia de prueba al someter su caso. Afirmó, en esencia, que el informe pericial y el testimonio del Dr. Miranda está huérfano de análisis empírico específico, por ejemplo, respecto a criterios de hospitalización reglamentaria.

Además, el tribunal determinó que el referido perito se basó exclusivamente en un análisis clínico subjetivo y en lo suspensivo, ya que en reiteradas ocasiones concluía que una hospitalización oportuna en o alrededor del 3 de enero de 2022 "quizás", "a lo mejor" o "posiblemente" pudo evitar la amputación. El foro *a quo* razonó que esto lo convirtió en un informe y testimonio huérfano de data empírica protocolar y a la misma vez incongruente. Así pues, destacó que no surgió de la prueba médica del hospital, que el examen de sangre arrojó glóbulos blancos en un conteo suficiente para concluir que había infección, y mucho menos una infección y/o neutrofilia bacteriana aguda el 3 de enero de 2022.

Posteriormente, los apelados presentaron un *Memorando de Costas*.[9] El 25 de noviembre de 2024, el apelante presentó una *Moción de Reconsideración* y su *Oposición al Memorando de Costas*.[10] Posteriormente, el TPI emitió una *Resolución* en la cual impuso al apelante las costas de los apelados por $681.42 y $8,618.00.[11]

Inconforme, el 20 de diciembre de 2024, el señor Feliciano Santiago presentó el recurso ante nos y alega los siguientes errores:

---

[8] Anexo XVII del *Recurso de Apelación,* págs. 117-122.
[9] Anexo XVIII y XIX del *Recurso de Apelación,* págs. 123-126.
[10] Anexo XX y XXI del *Recurso de Apelación,* págs. 127-134.
[11] Anexo XXIV del *Recurso de Apelación,* pág. 143.

Erró el Tribunal de Primera Instancia al desestimar la demanda bajo la Regla 39.2(c) de Procedimiento Civil, cuando la parte demandante presentó prueba que establece la negligencia de las partes demandadas, así como su relación causal con los daños reclamados.

Erró el Tribunal de Primera Instancia al imponer costas por los honorarios periciales de la parte demandada cuando no fue útil ni necesario para que la parte demandada prevaleciera.

El 14 de abril de 2025, Emergency Physician Providers, LLC presentó su *Alegato en Oposición*. Alegó, entre otros asuntos, que el apelante faltó a su deber de establecer que el Dr. Mattei era empleado o prestaba servicios para ellos. Afirmó que no hay razón por la que estos tengan que responder por la alegada impericia médica, cuando el Dr. Mattei no es médico empleado, ni contratado, ni contratista independiente, y tampoco tiene relación alguna con ellos.

El 15 de abril de 2025, el Dr. Mattei presentó su *Alegato en Oposición*. Indicó, en esencia, que se debe confirmar la *Sentencia* recurrida, ya que el apelante no pudo demostrar que se cometió impericia médica mediante preponderancia de prueba. Asimismo, sostuvo que el apelante no pudo probar que existe una relación causal entre la atención y el tratamiento médico brindado por este, y los daños alegados.

## II.

### A. Apreciación de la prueba

Es norma conocida que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no deben intervenir para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el foro primario. Regla 42.2 de Procedimiento Civil, *supra; Peña Rivera v. Pacheco Caraballo,* 213 DPR 1009, 1024 (2024); *Ortíz Ortíz v. Medtronic,* 209 DPR 759, 778 (2022); *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 219 (2021). Incurre en pasión, prejuicio o

parcialidad el juez "que actúe movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que someta prueba alguna". *Ortíz Ortíz v. Medtronic, supra,* pág. 779 (citando a *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013)). En cuanto al error manifiesto, este ocurre cuando el foro revisor está convencido de que se cometió un error "porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Méndez v. Morales*, 142 DPR 26, 36 (1996).

Ahora bien, la llamada deferencia judicial está predicada en que los jueces del TPI "están en mejor posición para aquilatar la prueba testifical porque tienen la oportunidad de oír, ver y apreciar el comportamiento del testigo". *Peña Rivera v. Pacheco Caraballo, supra,* pág. 1025 (citando a *Ortíz Ortíz v. Medtronic, supra,* pág. 779). De manera que, la norma general es que, si la actuación del TPI no está desprovista de una base razonable y no perjudica los derechos sustanciales de las partes, debe prevalecer su criterio dado que es a quien le corresponde la dirección del proceso. *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959). Así pues, como foro revisor la apreciación que hace el foro primario merece nuestra deferencia, ya que es este juez quien observa a las personas que declaran y aprecia su *demeanor. Pueblo v. Arlequín Vélez,* 204 DPR 117, 147 (2020).

### B. Impericia Médica

En lo pertinente, el Artículo 1536 del Código Civil de Puerto Rico, 31 LPRA sec. 10801, dispone que "la persona que por culpa o negligencia causa daño a otra, viene obligada a repararlo". En nuestro ordenamiento la responsabilidad civil extracontractual por impericia médica tradicionalmente se impone por la culpa o

negligencia de un facultativo médico bajo el referido artículo. No obstante, existe una presunción de corrección que cobija a la profesión médica, por lo que el demandante tiene el peso de la prueba para rebatirla. *Rodríguez Crespo vs. Hernández,* 121 DPR 639, 650 (1988). Conforme a esto, dicha presunción es únicamente rebatible mediante testimonio pericial. *Id.* Así pues, el *quantum* probatorio de la prueba es más riguroso que el de una acción ordinaria por daños al amparo del Art. 1536 del Código Civil de Puerto Rico, *supra.*

De modo que, para que el demandante prospere en su causa de acción requiere demostrar que el galeno no le brindó la atención que, conforme al estado de conocimiento de la ciencia y la práctica prevaleciente de la medicina, cumple con las exigencias profesionales generalmente reconocidas por la propia profesión médica. *López v. Dr. Canizares*, 163 DPR 119, 132 (2004) (citando a *Pérez Torres v. Blaudell Ramos*, 120 DPR 295, 302 (1988)). Por lo tanto, **este debe demostrar mediante preponderancia de la prueba que la acción negligente del médico fue el factor que con mayor probabilidad ocasionó el daño**. *Sucn. Pagán Berríos v. UPR y otros,* 206 DPR 317, 330 (2021); *Blás v. Hosp. Guadalupe,* 146 DPR 267, 322 (1998). (Énfasis suplido).

Sin embargo, "la negligencia del médico no se presume por el mero hecho de que el paciente haya sufrido un daño o que el tratamiento no haya sido exitoso". *Sucn. Pagán Berríos v. UPR y otros, supra,* pág. 330; *Rodríguez Crespo v. Hernández,* 121 DPR 639, 650 (1988). Por ello, la relación de causalidad entre el daño y el acto negligente no puede establecerse mediante meras suposiciones o conjeturas de que el daño se debió al incumplimiento del médico con su responsabilidad profesional. *Sucn. Pagán Berríos v. UPR y otros, supra,* pág. 330; *Santiago Otero v. Méndez,* 135 DPR 540, 549 (1994). Esto, ya que un médico no puede garantizar un

resultado favorable cada vez que interviene con un paciente. *Medina Santiago v. Vélez*, 120 DPR 380, 385 (1988).

Conviene señalar, que el médico no es negligente si el tratamiento brindado a su paciente, "aun cuando erróneo, está enmarcado en los linderos de lo razonable y es aceptado por amplios sectores de la profesión médica". *Sucn. Pagán Berríos v. UPR y otros, supra,* pág. 331. En esencia, para establecer un caso *prima facie* de impericia médica el demandante tiene que presentar prueba sobre: "(1) las normas mínimas de conocimiento y de cuidado médico aplicables a los médicos generalistas o especialistas; (2) que el demandado incumplió con las referidas normas de tratamiento del paciente, y (3) que el incumplimiento del médico fue la causa del daño sufrido por el paciente". *Id.*; *Arrieta v. De la Vega*, 165 DPR 538, 549, 548-549 (2005); *Medina Santiago v. Vélez, supra*, pág. 385.

### C. Costas

En nuestro ordenamiento jurídico, la concesión de costas está regulada por la Regla 44.1 de Procedimiento Civil, *supra*. En específico, la referida regla dispone lo siguiente:

(a) *Su concesión.* **Las costas le serán concedidas a la parte a cuyo favor se resuelva el pleito** o se dicte sentencia en apelación o revisión, excepto en aquellos casos en que se disponga lo contrario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los gastos incurridos necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que una parte litigante debe reembolsar a otra. 32 LPRA Ap. V, R.44.1. (Énfasis nuestro).

La parte que reclame el pago de costas debe presentar un memorándum de todos los gastos y desembolsos necesarios, incurridos durante la tramitación del pleito dentro del término de diez (10) días contados a partir del archivo en autos de copia de la notificación de la sentencia. Regla 44.1(b) de Procedimiento Civil,

*supra.* La resolución que emita el TPI podrá ser revisada por el Tribunal de Apelaciones.

Ahora bien, el Tribunal *a quo* tendrá que determinar la parte prevaleciente y cuáles de los gastos fueron necesarios y razonables. *Class Fernández v. Metro Health Care,* 214 DPR 348, 362 (2024). Esto, ya que no todos los gastos del litigio son recobrables como costas, sólo son recobrables aquellos necesarios y razonables para la tramitación del pleito. *Id.* En este sentido, el Tribunal Supremo de Puerto Rico ha determinado que los siguientes gastos son recobrables: "sellos de radicación de las alegaciones, sellos cancelados en las mociones, gastos de emplazamiento, sellos cancelados para efectuar embargos, transcripción de evidencia, deposiciones, entre otros". *Id.*

Por el contrario, los gastos ordinarios de las oficinas de los abogados, tales como sellos de correo, materiales de oficina y transcripciones de récords cuando no necesarias para los reclamantes no constituyen costas. *Andino v. A.A.A,* 123 DPR 712, 716 (1989). Asimismo, tampoco cualifica como costas el uso de un mensajero y del teléfono en términos de una gestión necesaria y relacionada con el caso cuando no se especifica. *Id.*, pág. 718.

"En cuanto a los peritos de parte, su compensación por vía de costas no es automática". *J.T.P. Dev. Corp. v. Majestic Realty Corp.,* 130 DPR 456, 466 (1992); *Andino Nieves v. A.A.A., supra,* pág. 716; *Meléndez v. Levitt & Sons of P.R.,* 104 DPR 797, 811 (1976). El Tribunal *a quo* concederá las costas a "su discreción evaluando su naturaleza y utilidad a los fines de determinar si el testimonio pericial presentado era necesario para que prevaleciera la teoría del que reclama los mismos". *J.T.P. Dev. Corp. v. Majestic Realty Corp., supra,* pág. 466.

**III.**

El apelante alega que erró el TPI al desestimar la *Demanda* bajo la Regla 39.2(c) de Procedimiento Civil, *supra,* por entender que la prueba no estableció la impericia médica. A su vez, aduce que el referido tribunal incidió al interpretar que la prueba pericial no fue suficiente para demostrar la negligencia de los apelados. Por último, arguye que dicho foro erró al imponerle las costas por los honorarios periciales de los apelados cuando no fue útil ni necesario para que estos prevalecieran.

Según surge de las estipulaciones no controvertidas, el 3 de enero de 2022, el señor Feliciano Santiago acudió a la Sala de Emergencias del Hospital Susoni debido a una herida en el talón del pie derecho.[12] Allí, el Dr. Figueroa documentó en el expediente médico una úlcera con tejido necrótico y secreciones en el talón derecho. Ante ello, este ordenó una serie de laboratorios y radiografías del pie derecho. A la 1:48 pm, el Dr. Figueroa consultó al Dr. José E. Mattei Díaz, podiatra. El Dr. Mattei evaluó al paciente a eso de las 8:30 pm, y lo dio de alta con cita de seguimiento en su oficina privada para el día 12 de enero de 2022. Las instrucciones dadas por el Dr. Mattei al paciente fueron que se limpiara el área, se la secara, que estuviera en descanso y que este lo vería el día 12 de enero de 2022 en su oficina.

No obstante, el 13 de enero de 2022, el apelante acudió a la Sala de Emergencia del Hospital Pavía Arecibo, debido a una úlcera infectada, gangrena y osteomielitis del talón derecho, y diabetes descontrolada. Como diagnósticos adicionales se documentó enfermedad vascular periférica y neuropatía diabética. Ante ello, el 14 de enero de 2022, se le practicó al apelante una operación exploratoria y se encontró gangrena del talón derecho, fascitis

---

[12] Véase, Anejo VII del *Recurso de Apelación,* págs. 42-83.

necrotizante del tendón de Aquiles y celulitis con abscesos del músculo gastrocnemio. Finalmente, el 19 de enero de 2022, bajo anestesia espinal, se le amputó, por debajo de la rodilla, la pierna derecha del señor Feliciano Santiago.

Así las cosas, y como parte esencial de los casos de impericia médica, el apelante contrató los servicios del Dr. Miranda, quien preparó el Informe Pericial, y en consecuencia, presentó su testimonio en el juicio.[13] El juez de instancia clasificó a dicho doctor como perito en medicina con especialización en sala de emergencia.[14] En el juicio, el Dr. Miranda aseguró que revisó los expedientes y récords médicos de la Sala de Emergencia de Hospital Metropolitano Dr. Susoni, el Hospital Pavía de Arecibo, y el de un procedimiento que se realizó el apelante en el 2020.[15] Este razonó que, la herida que posteriormente ocasionó la amputación, comenzó con una úlcera en el talón del pie derecho con tejido necrótico o muerto, y descargas o secreciones.[16] A su vez, este explicó que el apelante tenía condiciones comórbidas — condiciones crónicas que puede afectar el estado de salud al momento — como hipertensión arterial y diabetes *mellitus*.[17] Además, adujo que el señor Feliciano Santiago tenía un historial de fumar cigarrillos, lo cual producía complicaciones de cualquier trauma.[18]

No obstante, a preguntas en el contrainterrogatorio, se le preguntó al Dr. Miranda, si el 3 de enero de 2022 se documentó que no había *Cleocin*, así que se le ordenó *Levaquin*.[19] Este contestó en la afirmativa. Asimismo, este afirmó que se le administró al apelante insulina, 15 unidades intravenosa, entre otras cosas, de *sodium*

---

[13] TPO, 15 oct 2024, pág. 83.
[14] Véase, TPO, 15 oct 2024, pág. 76.
[15] TPO, 15 oct 2024, pág. 93.
[16] TPO, 15 oct 2024, pág. 116.
[17] TPO, 15 oct 2024, pág. 118.
[18] TPO, 15 oct 2024, pág. 119.
[19] TPO, 15 oct 2024, pág. 206.

*chloride* por suero.[20] De igual forma, este perito contestó en la afirmativa respecto a que el examen de sangre — los glóbulos blancos — se reportó como normal y, por lo tanto, no era compatible que el apelante tuviese infección.[21] También, admitió que cuando se dio de alta al señor Feliciano Santiago, este tenía los vitales bien y no tenía dolor, aun cuando no le habían dado analgésicos.[22] A su vez, validó que se le entregó al apelante un documento llamado "Instrucciones al Alta", que contenía como primera instrucción que fuera a su médico primario o especialista en las próximas veinticuatro (24) horas.[23]

Asimismo, el referido perito admitió que el apelante incumplió con las órdenes dadas por el hospital de ver a un médico en veinticuatro (24) horas, y que este no lo hizo hasta diez (10) días después.[24] El mismo perito aceptó que si el apelante hubiese seguido las recomendaciones de la orden médica dentro de las veinticuatro (24) horas probablemente no hubiese habido necesidad de amputarle la pierna.[25] De igual forma, el Dr. Miranda admitió que luego de que el señor Feliciano Santiago recibiera el tratamiento médico, este expresó en dos (2) ocasiones que tenía cero dolor.[26] Además, este afirmó que al señor Feliciano Santiago ser diabético, hipertenso y tener otras condiciones de salud, lo que ocasionó fue agravar y acelerar la infección.[27] Conforme a ello, el referido perito expresó que puede ser una posibilidad el que una infección se desarrolle en más o menos seis (6) horas y que para una persona con diabetes e hipertensa es un periodo más corto.[28]

---

[20] TPO, 15 oct 2024, pág. 211.
[21] TPO, 15 oct 2024, págs. 216-17.
[22] Transcripción de la Prueba Oral (TPO) del Juicio en su Fondo del 16 de octubre de 2024, pág. 17.
[23] TPO, 15 oct 2024, pág. 225.
[24] TPO, 16 oct 2024, pág. 15.
[25] TPO, 16 oct 2024, pág. 16.
[26] TPO, 16 oct 2024, págs. 16-17.
[27] *Id.*
[28] TPO, 16 oct 2024, págs. 14.

Por su parte, el señor Feliciano Santiago testificó en cuanto a las órdenes del Dr. Mattei sobre la herida, que este le recomendó que siguiera echándose *spray* y que todo iba a estar bien, y que lo llamara para sacar cita.[29] Además, explicó que le entregaron un papel amarillo del alta y que él preguntó si tenía alguna receta, a lo que una enfermera le contestó que no.[30] Añadió, que le dieron unos papeles para firmar, pero vocalmente no le dieron instrucciones de visitar un médico en veinticuatro (24) horas.[31] Luego del hospital, el apelante sostuvo que se atendía la úlcera con crema, antibiótico *Neosporin* y cosas así.[32] Asimismo, indicó que el Dr. Mattei le dijo que le daría cita para el 10 de enero de 2022 porque estaría de vacaciones, pero cuando llamó a su oficina nadie atendió su llamada.[33] No obstante, expresó que el 13 de enero de 2022 acudió a sala de emergencia porque no aguantaba el dolor. Ahora bien, nótese que, confesó que el pie le dolía desde el 4 de enero de 2022.[34] Cuando se le preguntó las razones de no acudir antes a Sala de Emergencia, explicó que siguió las instrucciones del Dr. Mattei y que no fue a ningún médico, ya que estaba esperando las indicaciones del referido doctor.[35]

El perito de la parte demandante declaró que era recomendada la hospitalización como medida de prevención, ya que el señor Feliciano Santiago padecía de diabetes e hipertensión. Según la evidencia vertida en juicio, notamos que pese a que el perito opinó que la infección del apelante era severa y ameritaba hospitalización, el Dr. Mattei dejó estabilizado al apelante. Esto, ya que el aludido doctor se aseguró que el apelante tuviese los vitales correctos y no tuviese dolor antes de ser dado de alta. De igual

---

[29] TPO, 16 oct 2024, pág. 145.
[30] TPO, 16 oct 2024, pág. 146.
[31] TPO, 16 oct 2024, págs. 177-180
[32] TPO, 16 oct 2024, págs. 146-147.
[33] TPO, 16 oct 2024, págs. 147-148.
[34] TPO, 16 oct 2024, pág. 183.
[35] Íd.

forma, el Dr. Mattei despachó al apelante al notar que la prueba de sangre se reportó como normal y, por lo tanto, no era compatible que este tuviese infección alguna.

Del testimonio del Dr. Miranda no surge cual era la norma, criterios y/o los estándares que debía seguir el Dr. Mattei cuando evaluó al señor Feliciano Santiago en la sala de emergencia. El Dr. Miranda reconoció no conocer sobre los estándares aplicables a un podiatra. Asimismo, el Dr. Miranda aceptó que si el señor Feliciano Santiago hubiere acudido a su médico primario en veinte cuatro (24) horas como se le inicio en el alta, lo más probable no hubiera tenido que amputar la pierna. Según la prueba presentada durante el juicio, el apelante, aun conociendo de sus condiciones de salud, postergó durante diez (10) días el ir a una Sala de Emergencia o a un médico generalista o especialista como se le indicó en la instrucción, aun cuando su úlcera evidentemente se le había empeorado. Incluso, el apelante admitió que, pese a que bajo el tratamiento del Dr. Mattei se le había ido el dolor, este empezó a sentir dolor desde el día después de haber sido de alta. No obstante, la parte apelante no acudió a un médico ni fue a la cita del 12 de enero de 2022 con el Dr. Mattei. Nótese que, el mismo perito del apelante admitió que la pierna se hubiese salvado si este hubiese seguido las instrucciones contenidas en la hoja del alta.[36]

Por tanto y según reseñamos, el apelante debió demostrar, mediante preponderancia de prueba, que el Dr. Mattei incumplió con las normas mínimas de conocimiento y cuidado médico aplicables en la situación particular de autos, y que dicho incumplimiento fue la causa de los daños sufridos por este. De la prueba presentada por la parte apelante, no se estableció cual era el estándar de la medicina en podiatria y cuál fue el incumplimiento

---

[36] TPO, 16 oct 2024, pág. 102.

del Dr. Mattei, para poder demostrar que fue la causa de los daños sufridos por el Sr. Figueroa.

Recordemos para que el apelante pudiera prevalecer en su reclamación de alegada impericia médica no bastaba establecer que hubo negligencia o una omisión, sino que era necesario presentar prueba suficiente para controvertir la presunción de corrección a favor del médico. Esta, no puede ser una mera posibilidad de que el daño se debió al incumplimiento por parte del médico de su obligación profesional.

Ahora bien, la parte apelante arguyó en su segunda demandada enmendada que Emergency Physician Providers, como operador de la sala de emergencias del Hospital Susoni fue negligente al no asignar a un facultativo medico una vez el Dr. Figueroa salió de su turno; por la negligencia del Dr. Mattei y por haber quebrantado sus propios contratos y by laws.

Surge de la prueba desfilada por la parte demandante, que cuando el Dr. Figueroa salió de su turno a las 4:00pm, el Dr. González Arce fue asignado a continuar atendiendo al demandante. Por otro lado, no se presentó prueba alguna para establecer que el podiatra, Dr. Mattei era empleado o prestaba servicios para Emergency Physicians Providers. El propio perito del demandante admitió que no tenía observaciones o señalamientos contra dicha entidad. Que la desviación o incumplimiento con los By Laws consistía en la tardanza del Dr. Mattei en contestar la consulta que había referido el Dr. Figueroa. De su testimonio no se establece como la tardanza en contestar la consulta por parte del Dr. Mattei, quien se encontraba de vacaciones, está relacionada con los daños reclamados por el demandante.

Es por ello, que concluimos que el primer señalamiento de error no se cometió.

Ciertamente, es muy lamentable lo sufrido por el señor Feliciano Santiago, por lo cual conviene que nos unamos a las expresiones de nuestro Tribunal Supremo sobre estos casos:

> Las acciones por alegada impericia médica constituyen o representan un reto especial para los jueces. Dichos casos siempre versan sobre la ocurrencia de un daño; uno que, por lo general, resulta impresionante y doloroso. No obstante el natural sentimiento de compasión que todo ser humano experimenta al enfrentarse al daño y sufrimiento de otro ser humano, los jueces tenemos que mantener siempre presente que el mero hecho de que haya ocurrido un daño no significa que el médico es civilmente responsable por el mismo. En otras palabras, no podemos darnos el lujo de que nuestros sentimientos dominen nuestro discernimiento. De así permitirlo, estaríamos incumpliendo con nuestra función como jueces. *Pérez Torres v. Blaudell Ramos*, 120 DPR 295, 297–298 (1988).

Por último, el apelante tampoco logró establecer que el TPI incidiera al aprobar el Memorando de Costas de los apelados. Esto, ya que el apelante sostiene que no se pudo justificar los gastos del perito de los apelados, el Dr. Luis E. Iguina. No obstante, resolvemos que los servicios de dicho perito fueron necesarios para llevar una defensa adecuada. Ciertamente, en casos de impericia médica, por su complejidad es esencial el testimonio pericial. Pese a que no fue necesario que el Dr. Luis E. Iguina testificara, este había incurrido treinta y ocho (38) horas en la evaluación del informe pericial del apelante, récord médico, literatura médica y redacción de informe pericial. Entendemos que $7,600.00 es una cantidad razonable y no excesiva en los honorarios de un perito en medicina. Por tanto, el segundo señalamiento de error tampoco fue cometido.

**IV.**

Por los fundamentos expuestos, confirmamos la *Sentencia* apelada.

Notifíquese.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones